Debra Joan ALLEN and Anthony Paul Allen, husband and wife, Plaintiffs,

v.

G.D. SEARLE & CO., a Delaware corporation, Defendant.

Donna KEYS, an individual, Plaintiff,

v.

G.D. SEARLE & CO., a corporation, and Searle Pharmaceuticals, Inc., a corporation, Defendants.

Civil Nos. 86–1402–FR, 86–1659–FR.

United States District Court, D. Oregon.

March 3, 1989.

Thomas J. Conlin, Robins, Kaplan, Miller
& Ciresi, Minneapolis, Minn., and Gayle L.

Troutwine, Williams & Troutwine, Portland, Or., for plaintiffs.

Timothy A. Pratt, Gregory L. Fowler, Shook, Hardy & Bacon, Kansas City, Mo., and Carol A. Hewitt, Janice R. Wilson, Lindsay, Hart, Neil & Weigler, Portland, Or., for defendants.

## OPINION

FRYE, Judge:

The matters before the court are the following motions:

1. Plaintiff Debra Allen's motion to strike G.D. Searle & Co.'s (Searle) affirmative defenses, or for partial summary judgment on those defenses (# );

2. Plaintiff Donna Keys' motion to strike Searle's affirmative defenses, or for partial summary judgment on those defenses (# );

3. The motion of both plaintiffs for declaratory judgment or for partial summary judgment concerning Searle's duty to warn plaintiffs directly (# ); and

4. Searle's motion to dismiss and for summary judgment (on 11 separate issues) (# ).

*Background and Outline of Issues*

Plaintiffs, Debra Joan Allen and Donna Keys, bring these actions against Searle to recover for personal injuries allegedly caused by the Copper–7 IUD contraceptive (Cu–7). Allen and Keys allege that their use of the Cu–7 caused pelvic inflammatory disease and subsequent infertility.

The Allens filed their complaint on November 10, 1986. The Allen complaint contains claims for negligence, misrepresentation and fraud, strict liability, implied warranties, express warranties, deceptive trade practices under both Montana and Oregon statutes, and punitive damages. Anthony Allen joined in each of the claims, but he has recently been voluntarily dismissed from the action. Debra Allen seeks compensatory damages of at least $500,000, plus punitive damages of at least $500,000.

Keys filed her complaint on November 12, 1986 in the Circuit Court of the State of Oregon for the County of Multnomah. Searle removed the action to this court. Keys alleges claims for strict liability and negligence, seeking $2,000,000 general damages and $5,500 special damages.

The legal issues in plaintiffs' motions largely overlap the issues raised in Searle's motion. In addition, the motions of Allen and Keys set forth virtually the same legal arguments to the facts in each case. To avoid repetition, the Discussion section of this memorandum will address all of the motions relating to each legal issue in a single subsection. The following is an outline of the issues raised by each of the motions:

1. Allen's motion to strike affirmative defenses or for partial summary judgment on those defenses attacks the following affirmative defenses asserted by Searle: statute of limitations (No. 1), federal preemption (Nos. 3, 5 and 6), superseding cause (No. 4), state of the art (No. 7), misuse (No. 8), contributory fault (No. 9), Comment k (No. 10), warranty disclaimer (No. 11), and lack of privity (No. 12). The issues of statute of limitations, federal preemption, Comment k, warranty disclaimer, and lack of privity are also raised in Searle's motion for summary judgment.

2. Keys' motion to strike affirmative defenses or for partial summary judgment on those defenses attacks the following affirmative defenses asserted by Searle: federal preemption (Nos. 3, 5 and 6), superseding cause (No. 4), state of the art (No. 7), misuse (No. 8), contributory fault (No. 9), and Comment k (No. 10). The issues of federal preemption and Comment k are also raised in Searle's motion for summary judgment.

3. Allen and Keys' motion for declaratory judgment or partial summary judgment concerning duty to warn plaintiffs directly; this issue is also raised in Searle's motion for summary judgment.

4. Searle's motion to dismiss and for summary judgment covers the following issues:

a) Summary judgment against Allen and Keys regarding federal preemption;

b) Summary judgment against Allen and Keys regarding Restatement (2d) of Torts section 402A, Comment k;

c) Summary judgment against Allen and Keys regarding adequacy of warnings;

d) Summary judgment against Allen regarding punitive damages;

e) Motion to dismiss and summary judgment against Allen regarding the Deceptive Trade Practices Act;

f) Summary judgment against Allen regarding fraud and misrepresentation;

g) Motion to dismiss and summary judgment against Allen regarding express and implied warranties;

h) Motion to dismiss and summary judgment against Allen regarding the statute of ultimate repose;

i) Motion to dismiss and summary judgment against Allen regarding impairment to future earning capacity;

j) Motion to dismiss and summary judgment against Anthony Paul Allen's non-consortium claims; and

k) Summary judgment against Keys regarding the statute of limitations.

### Undisputed Facts

1. *The Allen Case*

Defendant Searle is a Delaware corporation which has its principal place of business in the State of Illinois. Searle designed the Cu–7 IUD and manufactured it from 1974 until 1986. The United States Food and Drug Administration (FDA) approved the Cu–7 as a drug on February 25, 1974. That approval has never been revoked, although Searle voluntarily withdrew the Cu–7 from the market in 1986.

Debra Dennison Allen was born on March 23, 1956 and raised in Choteau, Montana. She completed a three year nursing course in 1977 and worked as a nurse between 1977 and 1979. Debra Allen was inserted with a Cu–7 IUD on March 23, 1978 in anticipation of her marriage to Anthony Allen on May 26, 1978. She was 21 years old at the time.

Following the insertion of the Cu–7, Debra Allen experienced increased bleeding during and between her menstrual periods, along with cramping and pelvic pain which she characterizes as "severe." At times the pelvic pain required Debra Allen to lie down while at work, and the bleeding required her to wear sanitary pads daily. In addition, Debra Allen developed low back pain.

Pelvic pain, pelvic bleeding, and low back pain are symptoms which may be indicative of pelvic inflammatory disease (PID), which is a bacterial infection of all or portions of a woman's upper genital tract, including the uterus, fallopian tubes, and ovaries. PID may cause the development of adhesive tissue (adhesions), which can damage the reproductive organs and lead to ectopic (tubal) pregnancy and infertility. However, Debra Allen's medical records do not show that she was diagnosed with PID while using the Cu–7, and she testified in deposition that no physician or health care provider told her that the Cu–7 caused any infection.

On May 22, 1978, Debra Allen returned to Dr. Johnson's office due to her concern about bleeding and cramping, as well as her inability to locate the tailstring of the Cu–7. Dr. Johnson had advised her to check for the tailstring regularly. Debra Allen discussed the possibility of removing the Cu–7, and Dr. Johnson recommended waiting until Allen's next menstrual period to see if the tailstring would reappear.

On June 15, 1978, Debra Allen visited Dr. Wolfe and decided to have the Cu–7 removed because she continued to have bleeding, cramping, and pelvic pain, and the tailstring had not reappeared. On June 16, 1978, Dr. Wolfe performed a dilation and curettage and removed the Cu–7 while Debra Allen was under general anesthesia. The pathology report diagnosed "acute and chronically inflamed endometrium." Debra Allen's symptoms of cramping, increased bleeding, and pelvic pain subsided after the removal of the Cu–7. Debra Allen claims that she was unaware at that time that her reproductive organs had been damaged.

Debra Allen began attempting to become pregnant in November, 1978. She met for

a fertility consultation with Dr. McKeown in March, 1979. Dr. McKeown performed exploratory surgery on Debra Allen in November 1980 and found adhesions on both fallopian tubes and ovaries. On April 2, 1981, Dr. Novy performed an exploratory laparotomy and made a post-operative diagnosis of PID and peritubal adhesions. Shortly thereafter, Debra Allen began taking fertility drugs. In July, 1983, Debra Allen underwent another surgical laprascopy by Dr. Novy to attempt to excise pelvic adhesions. In November, 1984, Debra Allen suffered an ectopic pregnancy, necessitating the partial removal of her right fallopian tube. In November, 1985, another ectopic pregnancy was diagnosed, necessitating removal of her left fallopian tube.

Debra Allen attempted in vitro fertilization in 1986 but was not successful. The Allens have adopted two children.

Debra Allen claims that she first became aware that the Cu–7 might have caused her infertility after reading a magazine article in early 1986.

### 2. *The Keys Case*

G.D. Searle & Co. and Searle Pharmaceuticals, Inc. (collectively, Searle) are Delaware corporations with their principal place of business in the State of Illinois. G.D. Searle & Co. designed the Cu–7 and manufactured it from 1974 until approximately June, 1978, and Searle Pharmaceuticals, Inc. manufactured the Cu–7 thereafter until it was removed from the market in 1986.

Donna Keys (then Mrs. Donna McBride) was inserted with a Cu–7 on December 2, 1975 by Dr. Manzer. She was 24 years old at the time. She wore the Cu–7 without apparent adverse symptoms until its removal on March 1, 1979. On that same date, she was inserted with a new Cu–7. Approximately four months after the insertion of the second Cu–7, Keys began complaining of dyspareunia (pain with sexual intercourse) and increased cramps, which can be symptoms of PID.

On March 4, 1980, Keys began suffering severe lower abdominal pain, frequent vomiting, chills, light-headedness, and fever. On March 5, 1980, her treating physician,

Dr. Vallion, made a diagnosis of PID. The Cu–7 was removed from Keys on March 7, 1980, and Keys was treated with antibiotics for PID. At that time, Keys was told by her physicians that the PID was caused by the Cu–7, and that it might have compromised her fertility by blocking her tubes with adhesions. By the end of March, 1980, the PID symptoms had subsided.

In November, 1980, Keys underwent a diagnostic test called a hysterosalpingogram (HSG), which can help to determine whether the fallopian tubes are open, but cannot assess whether the fallopian tubes are functioning correctly. Keys was told that her tubes "looked open." Keys claims that she believed at that time that PID had not caused her any permanent damage.

Subsequently, Keys married her present husband and began trying to conceive a child in 1984. On November 2, 1985, Keys had an ectopic pregnancy, which necessitated a dilation and curettage and the removal of her right fallopian tube. On May 29, 1986, Keys had a second ectopic pregnancy, which necessitated partial removal of the left fallopian tube. Later in 1986, Keys underwent an unsuccessful attempt at in vitro fertilization. The Keys plan to adopt a child.

### Discussion

These matters include motions to dismiss, motions to strike, and motions for partial or complete summary judgment. The applicable legal standards for such motions are as follows:

For purposes of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court views the complaint in the light most favorable to the plaintiff, and must generally accept as true the facts alleged. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). The court will dismiss a complaint for failure to state a claim only when it appears that the plaintiff can prove no set of facts in support of the claim which will entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957).

Under Fed.R.Civ.P. 12(f), "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." In order to survive a motion to strike, an affirmative defense must present questions of fact or of law. *Smith, Kline & French Laboratories v. A.H. Robins Co.,* 61 F.R.D. 24 (E.D.Pa.1973). If matters outside the pleadings are presented for consideration, the motion will be treated as one for partial summary judgment.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issues of material fact. Once this initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### 1. *Duty to Warn Directly*

■ Allen and Keys move for a declaratory judgment or partial summary judgment against Searle on the issue of Searle's duty to give direct warnings to Allen and Keys as consumers of the Cu–7. Searle contends that under the "learned intermediary" doctrine manufacturers of prescription drugs are not required to give warnings directly to consumers, but only to physicians.

Many jurisdictions, including Oregon, have adopted the learned intermediary doctrine. *See, e.g., Vaughn v. G.D. Searle & Co.,* 272 Or. 367, 536 P.2d 1247 (1975) (en banc), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974). The *McEwen* court held that "the duty of the ethical drug manufacturer is to warn the doctor, rather than the patient.... The manufacturer's compliance with this duty enables the prescribing physician to balance the risk of possible harm against the benefits to be gained by the patient's use of that drug." 270 Or. at 386–87, 528 P.2d 522.

The learned intermediary doctrine was applied by the Honorable Robert C. Belloni, United States District Judge, in an IUD case, *Steinmetz v. A.H. Robins Co.,* No. 75–716 (D.Or.1981). In the context of that case Judge Belloni stated:

There is no reason to believe that this concept applies with any less force to a case like plaintiff's which involves the use of a prescription device, the Dalkon Shield. The devices are available only through a physician's prescription. The physician performs an individualized balancing of the benefits and risks to the patient before prescribing the device. The doctor's insertion of the device is followed by periodic checkups and physician-patient consultations. The doctor who prescribes an IUD is no less a "learned intermediary" between the manufacturer and patient than was the physician in *McEwen, supra,* who prescribed oral contraceptives.

Other courts have held that the doctrine applies in the context of IUDs. *See, e.g., Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 738 P.2d 1210, 1227–28 (1987); *Beyette v. Ortho Pharmaceutical Corp.,* 823 F.2d 990, 992 (6th Cir.1987); *Terhune v. A.H. Robins Co.,* 90 Wash.2d 9, 577 P.2d 975 (1978).

Allen and Keys contend that Searle is not entitled to the protection of the learned intermediary doctrine because it sought to form consumer preferences by publicity and product literature aimed directly at consumers, so that the actual decision to use the Cu–7 was made by consumers rather than physicians. Plaintiffs argue that the learned intermediary doctrine may not apply in cases where no individualized medical judgment intervenes between a manufacturer of a prescription drug and the ultimate consumer. Plaintiffs cite *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974) (mass immunization programs for polio).

Allen and Keys' cases are not like *Reyes,* however, where children received polio vac-

cine without individual consultation with a physician. Allen and Keys each consulted with a physician who conducted examinations and then inserted the Cu–7. Thus, despite any promotion aimed directly at consumers, the physicians of Allen and Keys exercised "individualized medical judgment" justifying application of the learned intermediary doctrine.

Allen and Keys cite several cases, mostly under Michigan law, which hold that the learned intermediary doctrine does not apply to prescription contraceptives. *See, e.g., Odgers v. Ortho Pharmaceutical Corp.*, 609 F.Supp. 867 (E.D.Mich.1985); *Stephens v. G.D. Searle & Co.*, 602 F.Supp. 379 (E.D.Mich.1985); *MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 475 N.E.2d 65, *cert. denied*, 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 258 (1985). However, this court concludes that although a greater degree of patient participation may be involved in the choice of a prescription contraceptive than in some other prescription drugs, the physician makes the ultimate decision as to whether a particular contraceptive requested by the patient is appropriate.

This court will follow Judge Belloni's ruling in *Steinmetz* and apply the learned intermediary doctrine in this case. Allen and Keys' motions for declaratory judgment or partial summary judgment establishing a duty to warn consumers directly are denied.

### 2. *Adequacy of Warnings*

■ Searle moves for summary judgment against both Allen and Keys on the issue of the adequacy of the warnings which Searle provided to their doctors regarding the Cu–7.

The manufacturer of a prescription drug has the duty to make "timely and adequate warnings to the medical profession of any dangerous side effects produced by its drugs of which it knows, or has reason to know." *McEwen, supra,* 270 Or. at 385, 528 P.2d 522. The drug manufacturer is under a continuous duty to keep abreast of scientific developments regarding the safety of its product and to notify the medical

profession of any additional side effects discovered from its use. *Id.* at 386, 528 P.2d 522. The drug manufacturer must utilize methods of warning which will be reasonably effective to bring the warning home to prescribing and treating physicians. *Id.* at 388, 528 P.2d 522.

Allen and Keys have presented evidence that Searle had reason to know as early as 1969 that its IUD carried a risk of PID, which could lead to infertility and other injuries. Allen and Keys have also presented a quarterly report generated by Searle in 1974, which reported PID as a common complaint among IUD users and discussed the incidence of PID in users of the Cu–7. The package insert used by Searle from 1974 to 1977 stated only that "[u]ncommonly, pelvic infection has been reported."

A later package insert expanded the discussion of PID and warned that nulliparous women (women who have not borne offspring) are at increased risk. Allen and Keys contend that even this revised package insert does not reveal the full extent of the dangers. In addition, Allen and Keys contend that Searle made no effort to bring the changes in the warnings to the attention of prescribing and treating physicians but continued to issue promotional materials emphasizing the safety of the Cu–7 for nulliparous women.

Searle disputes most of these contentions. Consequently, there are genuine issues of material fact with regard to Searle's compliance with its duty to warn Allen and Keys. Accordingly, Searle's motion for summary judgment on the issue of the adequacy of warnings is denied.

### 3. *Comment k*

■ Searle moves for summary judgment against both Allen and Keys on the issue of whether the Comment k exception to Section 402A of the Restatement (Second) of Torts applies to the Cu–7. Allen and Keys move to strike or for partial summary judgment against Searle's affirmative defense based on Comment k.

Section 402A sets out the doctrine of strict product liability. Comment k to Section 402A states:

k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the presecription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use,

merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk. (Emphasis in original.)

Section 402A and its comments are incorporated into Oregon law by O.R.S. 30.920. Most other states have adopted section 402A and its comments either by judicial decision or by statute. However, there is some conflict in the various jurisdictions as to the application of Comment k to prescription drugs.

Searle contends that Comment k precludes Allen and Keys' claims premised on strict liability and negligent design. Searle argues that under both Oregon and California law all prescription drugs are unavoidably unsafe products, to which Comment k applies.[1]

Most of the courts which have considered the issue have concluded that a prescription drug is unavoidably unsafe if it meets all of the requirements of Comment k. *Coursen v. A.H. Robins Co.,* 764 F.2d 1329, 1338 (9th Cir.1985). These requirements include a showing that the product is incapable of being made safe for its intended and ordinary use; that the benefits of the product justify its marketing and use despite the unavoidable risks; that the product is properly prepared and marketed; and that the product is accompanied by proper directions and warnings. Comment k is an affirmative defense, and the defendant bears the burden of proving its applicability. *Id.*

As discussed in Section 2 of this opinion, Allen and Keys have raised factual issues as to the adequacy of Searle's warnings to physicians regarding the risks of the Cu–7.

---

**1.** Searle contends that Oregon law applies to Allen's claims and California law applies to Keys' claims. Allen and Keys contend that Oregon law applies to all claims. The choice of law determination depends in part on factual issues which preclude summary judgment regarding choice of law at this point.

However, it appears that if California law applies to Keys' claims, the recent decision of the California Supreme Court in *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988), will require partial summary judgment in favor of Searle on the issue of its

liability for design defects. The *Brown* decision holds that "a manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution." 245 Cal.Rptr. at 424, 751 P.2d at 482–83. Although *Brown* concerned injuries caused by the drug DES, the court specifically held that all prescription drugs were within the Comment k exemption. 245 Cal.Rptr. at 424 n. 11, 751 P.2d at 482 n. 11.

A related issue is raised by the contention of Allen and Keys that Searle nullified or diluted the effect of its warnings by aggressively marketing the Cu–7, and emphasizing its safety and desirability for nulliparous women, during the period when the FDA was about to impose increased warning requirements regarding the risks of PID in nulliparous women. Searle has not responded to this contention. Therefore, the issue of whether Searle properly marketed the Cu–7 remains open.

Allen and Keys also contend that Searle did not properly prepare the Cu–7, presenting evidence that there were defects in the manufacturing process. Searle has not responded to this contention, leaving this issue unresolved.

Searle relies most heavily on its contention that product liability claims for the defective design of prescription drugs are barred by Comment k. The Oregon Supreme Court has not directly addressed this issue.[2] The decision of the Ninth Circuit in *Coursen, supra*, 764 F.2d at 1336–38, supports submitting the issue of defective design to the jury. In *Coursen*, several women claimed that the Dalkon Shield had caused them to contract PID. The court allowed evidence regarding the alleged design defects in the Dalkon Shield and instructed the jury that it could consider whether the Dalkon Shield was defective in comparison to other IUDs. *Id.* at 1336–37.

In the recent case of *Senn v. Merrell–Dow Pharmaceuticals, Inc.*, 305 Or. 256, 751 P.2d 215 (1988), the Oregon Supreme Court discussed Comment k, although it declined to make a determination on that issue on the basis of the appellate record. *Senn* involved injuries to a child caused by diphtheria, tetanus and pertussis vaccine (DPT). The court indicated that an evidentiary hearing was needed regarding issues such as "the vaccine's efficacy, the degree of risk attending its use, and the extent to which it is in fact *'unavoidably'* unsafe.'" *Id.* at 263 n. 4, 751 P.2d 215 (emphasis in

original). The *Senn* decision indicates that the Oregon court may not adopt the approach of the California Supreme Court in *Brown, supra*, 44 Cal.3d at 1049, 245 Cal. Rptr. at 412, 751 P.2d at 470, which held that Comment k precludes claims of defective design against all prescription drugs.

Allen and Keys have presented evidence that the design of the Cu–7 heightened the risk of PID in several ways. For example, Allen and Keys argue that the tailstring of the device could have been made from material which was less likely to facilitate the ascent of bacteria into the uterus. They also contend that it would have been safer to place the tailstring inside the inserter tube.

The court concludes that Allen and Keys' evidence creates factual issues regarding the claim of defective design. It appears that under the present state of the law, an Oregon court would allow such evidence to go to the jury. Therefore, Searle's motion for summary judgment on the issue of Comment k is denied. Allen and Keys' motions to strike or for summary judgment against Searle's affirmative defense based on Comment k (No. 10) are denied.

### 4. *Federal Preemption*

■ Searle moves for summary judgment against both Allen and Keys, asserting that federal law preempts all claims regarding the safety of the Cu–7. Allen and Keys move to strike or for partial summary judgment against Searle's affirmative defenses based on federal preemption (Nos. 3, 5 and 6).

Searle contends that a jury verdict in favor of Allen and Keys would require a conclusion that the Cu–7 is unreasonably dangerous, despite its approval by the FDA as a "safe and effective" product as labeled. Searle argues that this creates a direct conflict between federal statutory law and state tort law which must be resolved in favor of federal law. Searle also

---

**2.** Two early product liability cases upheld verdicts in favor of defendants who were manufacturers of prescription drugs, but did not specifically discuss Comment k. *Lewis v. Baker, Richardson–Merrell, Inc.*, 243 Or. 317, 413 P.2d 400

(1966), *overruled in part, McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522 (1974); *Cochran v. Brooke*, 243 Or. 89, 409 P.2d 904 (1966).

contends that the Cu–7 falls into an express preemption provision of the Medical Device Amendments to the Food, Drug and Cosmetic Act (FDCA).

The Supreme Court has identified three types of preemption:

1. Congress may preempt by explict language;

2. Congress may indicate an intent to occupy an entire field of regulation; or

3. Actual conflict with federal law requires preemption:

(a) when compliance with both state and federal law is impossible; or

(b) when state law obstructs congressional purpose. *Michigan Canners and Freezers Ass'n v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984). Searle argues that all three types of preemption apply in this case. Allen and Keys contend that there is no basis for preemption of state tort remedies for injuries caused by a product approved by the FDA.

Searle asserts that the Medical Device Amendments to the FDCA, 21 U.S.C. § 360K, enacted in 1976, expressly preempt product liability claims for the Cu–7. Searle relies on the following language:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> > (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
> >
> > (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. 360K (1988).

Searle contends that although the FDA approved the Cu–7 as a drug, not a device, as a practical matter the FDA also treated the Cu–7 as a device. Searle points out that in 1977 the FDA promulgated uniform labeling regulations for all IUDs, whether drug or device. 21 C.F.R. 801.427; 21 C.F.R. 310.502. Allen and Keys respond that the FDA continued to recognize the distinction between IUDs as drugs and IUDs as devices after the Medical Device Amendments. The FDA commented:

> The agency's policy of treating some IUDs as drugs and others as devices is unaffected by the revised definition of device found in the federal Food, Drug and Cosmetics Act, as amended by the Medical Device Amendments of 1976.

52 Fed.Reg. 23772 (1977).

Searle has produced no evidence indicating that the FDA did not continue to treat the Cu–7 as a drug after the Medical Device Amendments. Indeed, Searle has referred to the Cu–7 as a drug, both in its arguments to this court regarding Comment k and the learned intermediary doctrine, and in the depositions of its employees. Viewing Searle's evidence in the most favorable light, the Cu–7 is at most both a drug and a device, and the Medical Device Amendments do not exempt drugs. *Accord, Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1298 (D.Minn.1988) (Because "the FDA considers the Cu–7 to be a prescription drug, section 360k simply does not apply.")[3]

Next, Searle argues that Allen and Keys' state product liability claims against the Cu–7 are preempted because a jury verdict against Searle would conflict with the congressional delegation of drug safety decisions to the FDA, and because the FDA has occupied the entire field of the IUD and its safety by pervasive regulation. However, Searle does not satisfactorily distinguish the decision in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), where the Supreme Court refused to set aside a ten million dollar punitive damages award based on state tort law, despite finding pervasive federal regulation of the nuclear industry. The personal injuries in *Silkwood* arose

---

**3.** The court does not reach the issue of whether state tort liability constitutes a "requirement" within the terms of the Medical Device Amendments. There appears to be a doctrinal split between the circuits on this issue, and the parties have not cited any Ninth Circuit decisions.

from the escape of plutonium from a federally licensed nuclear facility.

The *Silkwood* opinion noted that states are precluded from regulating the safety aspects of nuclear energy, 464 U.S. at 241, 104 S.Ct. at 617, but concluded:

> No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less.

464 U.S. at 256, 104 S.Ct. at 625. The Supreme Court also stated that "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Id.* at 251, 104 S.Ct. at 623.

A number of courts have applied *Silkwood* in state tort law cases involving products regulated by the FDA. *See, e.g., Kociemba, supra,* 680 F.Supp. at 1299 (finding that federal regulation of the Cu–7 and state tort law remedies co-exist); *MacGillivray v. Lederle Laboratories,* 667 F.Supp. 743 (D.N.M.1987) (pertussis vaccine); *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483 (D.Kan.1987) (DPT vaccine).

Numerous decisions have held that the regulations of the FDA establish minimum standards but do not conflict with state law which sets higher standards for due care and safety in the manufacture of drugs. *See, e.g., Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir.1981) (oral contraceptives); *Salmon v. Parke, Davis and Co.,* 520 F.2d 1359 (4th Cir.1975) (Chloromycetin, an antibiotic); *Kociemba, supra,* 680 F.Supp. at 1299; *Stromsodt v. Parke–Davis and Co.,* 257 F.Supp. 991, 997 (D.N.D.1966), *aff'd,* 411 F.2d 1390 (8th Cir. 1969) (Quadrigen, a vaccine). In *McEwen, supra,* an action for injuries caused by an oral contraceptive, the Oregon Supreme Court stated:

> We hold that the warnings given by an ethical drug manufacturer may be found inadequate, "[a]lthough all of the government regulations and requirements have been satisfactorily met in the production and marketing of [the drug], and in the changes made in the literature * * *."

270 Or. at 398, 528 P.2d 522. (quoting *Yarrow v. Sterling Drug, Inc.,* 263 F.Supp. 159, 162 (D.S.D.1967), *aff'd,* 408 F.2d 978 (8th Cir.1969).

The only cases cited by Searle which deal with products regulated by the FDA are three cases regarding tampons, which have been held (although not uniformly) to fall within the exemption of the Medical Device Amendments. Compare *Moore v. Kimberly–Clark Corp.,* 676 F.Supp. 731, 733–35 (W.D.La.1987) (federal preemption) with *O'Gilvie v. Int'l Playtex, Inc.,* 609 F.Supp. 817 (D.Kan.1985), *aff'd,* 821 F.2d 1438 (10th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988) (no preemption).

The court finds that tort claims under Oregon law for injuries caused by the Cu–7 are not preempted by federal law. Therefore, Searle's motion for summary judgment on the issue of federal preemption is denied. The motions of Allen and Keys for summary judgment against Searle's affirmative defenses based on federal preemption (Nos. 3, 5 and 6) are granted.

## 5. *Statute of Ultimate Repose—Allen*

■ Searle moves to dismiss or for summary judgment against Allen's claims on the grounds that Allen's claims are barred by the statute of ultimate repose for product liability actions. Allen moves to strike or for partial summary judgment against Searle's affirmative defense based on the statute of limitations (No. 1).

O.R.S. 30.905 sets out the statute of limitations for product liability actions in Oregon:

> (1) Notwithstanding ORS 12.115 or 12.140 and except as provided in subsection (2) of this section and ORS 30.907, a product liability civil action shall be commenced not later than eight years after

the date on which the product was first purchased for use or consumption.

(2) Except as provided in ORS 30.907, a product liability civil action shall be commenced not later than two years after the date on which the ... injury or damage complained of occurs.

Oregon courts have held that a "discovery" rule applies to subsection (2) of O.R.S. 30.905, so that an action is timely if it is filed within two years after the plaintiff discovered, or reasonably should have discovered, her cause of action. *Baird v. Electro Mart Factory Direct, Inc.*, 47 Or. App. 565, 572, 615 P.2d 335 (1980). Oregon courts have construed subsections (1) and (2) together to mean that there is a ten-year period of ultimate repose for product liability actions:

[I]f an injury occurred within eight years of the date the product was first purchased, the injured party had an additional two-year period following the injury to bring the action. That two-year period was characterized as a "grace period" by the committee.

47 Or.App. at 572, 615 P.2d 335.

Two decisions have applied the Oregon statute of ultimate repose in contraceptive cases. *Dortch v. A.H. Robins Co.*, 59 Or. App. 310, 650 P.2d 1046 (1982); and *Philpott v. A.H. Robins Co.*, 710 F.2d 1422 (9th Cir.1983).

Allen purchased a Cu–7 on or about March 23, 1978. Therefore, her claim is barred unless she discovered her cause of action before March 23, 1986 and filed her action within two years of the discovery. Allen claims that she discovered her cause of action in January or February, 1986 after her husband showed her an article from a news magazine.

Allen has presented evidence that, although she was trained and worked as a nurse, she received little training regarding IUDs and was not aware of any possible connection between the Cu–7 and PID or infertility. Allen states that she was never told by any health care provider that the Cu–7 was related to her infection or subsequent infertility before she filed this action.

Searle contends that Allen is bound by her deposition testimony in which she testified that she discovered her cause of action after reading a magazine article in November of 1986. (Allen Deposition, pp. 151–55.) If Allen discovered her cause of action after March 1986, her claim is barred under O.R.S. 30.905.

Allen submitted a correction sheet after her deposition was taken, changing the discovery date to November or December of 1985. In connection with the present motions, Allen has submitted an affidavit in which she states that after further review of her records, she is able to fix the discovery date as January or February of 1986. If Allen discovered her cause of action between November, 1985 and February, 1986, her claim is timely because she discovered the claim within eight years of the purchase of the device and filed suit within two years of the discovery of the claim.

The court finds that Allen has submitted evidence sufficient to create an issue of fact as to when she discovered her cause of action. Allen has provided explanations for the changes in her testimony which a jury may find plausible. Further, Allen has submitted the affidavit of one of her attorneys, Michael L. Williams, who states that he was contacted regarding Allen's claim in February of 1986. This evidence may support Allen's sworn statement that she discovered her cause of action in January or February of 1986.

In addition, there are issues of fact regarding Allen's claim that she discovered her cause of action less than two years before she filed suit. Allen has testified that although she was trained and worked as a nurse, she did not know that there was any possible connection between IUDs in general, or the Cu–7 in particular, and PID or infertility.

Searle's motion to dismiss and for summary judgment against Allen is denied. Allen's motion to strike or for summary judgment against Searle's affirmative defense based on the statute of limitations (No. 1) is denied.

## 6. *Statute of Limitations—Keys*

■ Searle moves for summary judgment against Keys' action on the grounds that it is barred by the applicable statute of limitations.[4]

Keys was first inserted with a Cu–7 in December, 1975. During the consultation with her physician, Dr. Manzer, she signed a consent form which warned her that side effects and complications can occur with an IUD, including pregnancy, tubal pregnancy, pain and cramping, infection, and death. Keys has testified that this form was presented to her at the last minute before the Cu–7 was inserted, and that she does not remember reading it. Keys wore this Cu–7 without incident until it was removed on March 1, 1979.

Keys also states that she based her decision to begin using the Cu–7 on what her doctor told her about the Cu–7 and upon magazine articles about IUDs and the Cu–7 in particular. Keys has identified several magazine articles which she believes influenced her decision, none of which mention a risk of infertility from IUDs or the Cu–7.

On March 1, 1979, a second Cu–7 was inserted by Dr. Manzer to replace the original Cu–7. Keys testified that Dr. Manzer did not discuss any risks of using the Cu–7, but asked only if Keys had suffered any problems with the device. In March, 1980, Keys received medical treatment for what was diagnosed as PID. The Cu–7 was removed in the course of this treatment.

Keys testified that she vomited, had chills, was light-headed, and had lower abdominal pain. Keys states in her affidavit that "[t]he doctors explained that they thought the Cu–7 I was using was causing the problem, and the Cu–7 was therefore removed two days later. The doctors gave me antibiotics to treat the infection, and my symptoms went away." (Keys Affidavit, p. 4, para. 9). Keys also stated:

The doctors I saw at the Medical Clinic in Portland had explained to me that my pelvic inflammatory disease might have caused blockage of my fallopian tubes preventing me from having children once I decided to do so. I had always planned on having children in the future. My doctors explained that there was a procedure, called a salpingogram, which I should undergo after waiting six months following my infection which could determine whether my tubes had been blocked by the pelvic inflammatory disease. Because of what my doctors told me concerning this test, I decided to have a salpingogram performed and underwent that test in November 1980.

(Keys Affidavit, pp. 4–5, para. 11).

In her affidavit, Keys describes her understanding of the results of the salpingogram test:

Immediately following the test, Dr. Fulsher told me that my tubes "looked open." This was a great relief to me since I thought my tubes had not suffered any damage from the pelvic inflammatory disease I experienced in March 1980. Consequently, I did not believe I had suffered any serious or permanent injury as a result of my pelvic inflammatory disease, and I thought I would be able to conceive and bear children.

(Keys Affidavit, p. 5, para. 12). In her deposition, Keys stated that the doctor said, "From what I can tell, they look open," and that he did not suggest that any further testing was necessary. (Keys Deposition, p. 99).

Keys states that she used birth control pills for contraception from March, 1980 until March, 1984, when she began to attempt to become pregnant. She then suffered ectopic pregnancies in November, 1985 and May, 1986. Keys states that:

Prior to my first ectopic pregnancy in November 1985, I had no idea that the pelvic inflammatory disease I had suffered in March 1980 had damaged the lining of my fallopian tubes to prevent a fertilized egg from passing down the tube into the uterus. This is when I first

---

4. Searle contends that Keys' claim is governed by California law. However, as Searle concedes that the result would be the same whether the law of the State of Oregon or the law of the State of California is applied, this court will consider only the law of the forum state, the State of Oregon.

learned that the Cu–7 had caused serious, permanent injury to my fallopian tube and had impaired my ability to have a child.

(Keys Affidavit, pp. 6–7, para. 16).

Searle contends that Keys' action is barred because 1) she knew she had PID in 1980; 2) she was told that the PID was caused by the Cu–7; and 3) she was told that the PID might have damaged her fallopian tubes, which could cause infertility. Searle argues that Keys should have filed suit within two years after March, 1980 because she was aware at that time that the Cu–7 had caused her PID.

Keys responds that she did not discover, nor could she reasonably have discovered, her infertility and its connection to the Cu–7 until November, 1985, when she suffered her first ectopic pregnancy. In fact, Keys contends that she took all possible steps to determine whether the PID· in March, 1980 had caused infertility or related problems, and was reassured by the results of the salpingogram. Keys maintains that she is seeking damages for the injury to her fallopian tubes, the ectopic pregnancies, and her infertility, and not for the PID she suffered in 1980. Thus, Keys contends that she timely filed this action within two years after discovery of her claim.

Keys relies upon *Schiele v. Hobart Corp.*, 284 Or. 483, 587 P.2d 1010 (1978), in which Schiele sued for personal injuries caused by fumes from a meat wrapping machine when she worked as a meat wrapper for Fred Meyer. In May or June of 1972, Fred Meyer purchased and installed Hobart Corporation's meat wrapping machine, which used a hot wire to cut the polyvinyl chloride meat wrapping film. In December of 1982, Schiele began using the machine during a considerable part of her work day.

Soon after beginning to use the machine, Schiele experienced a variety of health problems: nausea, dizziness, choking, coughing, and difficulty catching her breath. Almost from the outset, Schiele associated these problems with the fumes which the machine generated as its hot wire cut the polyvinyl chloride film. Schiele's symptoms intensified between January, 1983 and February, 1984. In March, 1974, Schiele was hospitalized for pulmonary pneumonia. In April, 1974, her doctors informed her that her illness was possibly due to exposure to polyvinyl choloride fumes. Schiele filed her complaint on March 8, 1976.

Hobart Corporation argued that Schiele's action was barred because Schiele had suspected that the fumes were causing health problems more than two years before she filed her complaint. The Oregon Supreme Court reversed the trial court's order of summary judgment against Schiele, holding that it could not say as a matter of law that a reasonably prudent person would have apprehended that she was being seriously or permanently injured more than two years prior to the commencement of Schiele's action. 284 Or. at 491, 587 P.2d 1010.

The court considered a number of cases regarding the statute of limitations for occupational disease claims, and concluded that "[t]hese cases stand for the proposition that the statute of limitations on claims involving negligent infliction of an occupational disease does not begin to run until the plaintiff knows, or as a reasonably prudent person should know, that he has the condition for which his action is brought and that defendant has caused it." 284 Or. 489, 587 P.2d 1010.

Keys contends that *Schiele* governs not only occupational disease claims, but personal injuries of any nature which cannot reasonably be discovered within two years after the injury actually occurred. Keys relies on the following language:

[W]e reject defendants' claim that knowledge of symptoms and their causal relationship to defendants' actions in and of itself initiates the running of the statute. We do not believe the legislature intended that the statute be applied in a manner which would require one to file an action for temporary sickness or discomfort or risk the loss of a right of action for permanent injury.

The statute of limitations begins to run when a reasonably prudent person associates his symptoms with a serious or permanent condition and at the same time perceives the role which the defendant has played in inducing that condition.

*Id.* at 490, 587 P.2d 1010.

Searle argues that *Schiele* applies only to occupational disease cases where injuries are inflicted cumulatively, not on one identifiable occasion. Searle relies on the Oregon Court of Appeals' decision in *Guiley v. Hammaker,* 55 Or.App. 921, 640 P.2d 664, *rev. denied,* 292 Or. 863, 648 P.2d 850 (1982), in which the plaintiff sued for personal injuries caused by an automobile accident more than seven years earlier. The automobile accident occurred on January 13, 1973, when the plaintiff was fourteen days old. At that time, he was treated by a physician for a small abrasion on his head. There were no other apparent injuries.

In 1980, Guiley began to exhibit learning difficulties in school. An examination revealed damage to an optic nerve, resulting in impaired acuity in the right eye. Guiley filed suit in July, 1980. The trial court dismissed the action on the basis of the statute of limitations, although the plaintiff and his guardian ad litem alleged that they were unaware of and could not have discovered the injury to the optic nerve until April, 1980. The Court of Appeals upheld the dismissal because the plaintiff knew that he sustained an injury and knew of its cause in 1973, although he did not determine the full extent of the injury until later.[5]

The court considered *Schiele* as the case most closely resembling the facts in *Guiley,* but held that *Schiele* was limited to its peculiar facts as a case relating to occupational disease. 55 Or.App. at 926-27, 640 P.2d 664. The court noted that "[o]ccupational diseases arise out of a course of events, not out of a discrete act; it is the development and awareness of the disease,

not some symptomatology, which is crucial." *Id.* at 926, 648 P.2d 850.

The recent Court of Appeals decision in *Gannon v. Rogue Valley Medical Center,* 92 Or.App. 314, 758 P.2d 873, *rev. denied,* 307 Or. 145, 765 P.2d 813 (1988), followed *Guiley.* It deals with a situation which is more comparable to Keys' claim. On June 10, 1982, Mary Gannon underwent a myelogram. She contracted meningitis because the defendant failed to prevent the introduction of infectious organisms during the myelogram. Later, as a result of the meningitis, she suffered chronic organic brain syndrome and accompanying psychiatric problems. She did not discover that the meningitis was a cause of the syndrome until June 30, 1984, and filed her action on June 27, 1986.

Gannon knew that the meningitis may have been caused by defendant's negligence as early as May, 1982. She did not file suit at that time because she had recovered from the meningitis and believed that her injuries were not serious enough to warrant a lawsuit. Her organic brain syndrome was diagnosed on August 3, 1983, but her psychiatrists could not identify the cause until June, 1984. The Court of Appeals held that the statute began to run in 1982, when Gannon realized that the defendant might have negligently administered the myelogram, causing her meningitis.

It is difficult to distinguish Keys' case from the facts in *Gannon.* According to Keys' testimony, she knew in 1980 that she had suffered PID because of the Cu-7, but did not file suit because she did not think the Cu-7 had caused her serious or permanent injury. Keys testified that she did not discover her infertility for several years, and could not reasonably have linked the Cu-7 with her infertility or ectopic pregnancies until late in 1985.

Both *Guiley* and *Gannon* recognize that the full extent of injuries may not be discoverable until after the statute of limitations has run on a claim, but hold that the statute of limitations begins to run when a plaintiff knows that he or she has suffered

---

5. The court noted that Oregon statutes provide an additional five years to minors under O.R.S. 12.160, so that Guiley had a total of seven years in which to file his action.

*some* injury because of the defendant's acts. It is undisputed that Keys believed she had suffered PID in March, 1980 because of the Cu–7. Keys was told in March, 1980 that the PID could have damaged her fallopian tubes, resulting in infertility. The hopeful results of the salpingogram in November, 1980 put Keys into the same position as Guiley and Gannon, who innocently believed that they had not suffered any serious or permanent injuries. Although the result appears harsh, the court finds that it is bound by the holdings in *Guiley* and *Gannon.*

The enactment of 1987 Oregon Laws, Chapter 4, Section 5 does not change the result. That provision states:

> Notwithstanding ORS 30.905, a product liability civil action against the manufacturer of an intrauterine contraceptive device shall be commenced not later than two years after the date on which the plaintiff *first* discovered, or in the exercise of reasonable care should have discovered, the injury and the cause of the injury. (Emphasis added.)

Although no Oregon court has yet construed this section, it does not appear to change the definition of "injury" under Oregon law. As discussed above, Keys discovered that the Cu–7 had caused her an injury, PID, in March, 1980. Under Oregon law, the statute of limitations began to run against Keys at that time although she had not yet discovered the full extent of her injuries.

Keys filed her action more than two years after the statute of limitations began to run. Her claim against Searle is barred. Searle's motion for summary judgment against Keys is granted.

### 7. *Punitive Damages Claims*

Searle moves for summary judgment against Allen's claims for punitive damages, contending that such damages are unconstitutional. The court denied this portion of Searle's motion at the hearing on these motions.

### 8. *Unlawful Trade Practices Claim*

Searle moves to dismiss or for summary judgment against Allen's claim under the Oregon Unlawful Trade Practices Act (UTPA), O.R.S. 646.605 et seq. Searle contends that the private enforcement provision of UTPA does not provide a remedy for personal injuries. Searle also argues that Allen's claim falls into the exemption provided in O.R.S. 646.612(1) for "[c]onduct in compliance with the orders or rules of, or a statute administered by a federal, state or local governmental agency" because Searle's labeling and sales of the Cu–7 are governed by FDA regulations.

Allen responds that the UTPA should be interpreted broadly to protect consumers from unfair or deceptive trade practices resulting in personal injury, and that she has suffered economic loss for medical expenses caused by Searle's deceptive trade practices. Allen also contends that the exemption of O.R.S. 646.612(1) cannot be strained to apply in instances where a manufacturer has misrepresented the hazards of its product to the FDA in order to obtain approval.

O.R.S. 646.638(1) provides in relevant part:

> [A]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of wilful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action in an appropriate court to recover actual damages or $200, whichever is greater.

Punitive damages and attorney fees are also recoverable under this provision.

In *Gross–Haentjens v. Leckenby,* 38 Or. App. 313, 589 P.2d 1209 (1979), the Oregon Court of Appeals held that O.R.S. 646.638 does not provide a remedy for loss resulting from personal injury:

> It is to be noted that this "private enforcement" provision (ORS 646.638), although providing for the recovery of "actual damages," confers the right to bring such an action upon a person who "suffers any ascertainable loss of money or property, real or personal." This is

consistent with its purpose to provide for "restitution," i.e., restitution for economic loss suffered by a consumer as the result of a deceptive trade practice.

Plaintiff has not called our attention to anything in the legislative history of ORS 646.638 to support his contention to the effect that by the adoption of that provision the legislature intended to confer upon private individuals a new cause of action for personal injuries, including punitive damages and attorney fees.

38 Or.App. at 317, 589 P.2d 1209.

The plaintiff in *Leckenby*, who was injured in an automobile accident, alleged that the dealer from whom she bought her car violated the UTPA by representing that the car's brakes would be checked and repaired. *Id.* at 315, 589 P.2d 1209. Although the *Leckenby* decision does not discuss the point, it may be assumed that the plaintiff sought damages for medical expenses and property damage in her "personal injury" action.

Allen suggests that this court should reexamine the propriety of the *Leckenby* decision and follow the decision in *Kociemba, supra,* which held that the consumer protection statutes of the State of Minnesota covered the personal injury claim of a Cu–7 user. However, *Kociemba* was decided under Minnesota law and interpreted a statute which uses different and less restrictive language than does O.R.S. 646.638. This court is bound to follow Oregon law interpreting the private cause of action provided by O.R.S. 646.638.

The *Leckenby* decision is an interpretation of Oregon law by an Oregon appellate court which has not been overturned or disapproved by the Oregon Supreme Court or the Oregon legislature. Allen has not suggested any way in which *Leckenby* is distinguishable from her case. Accordingly, this court finds that it is bound by *Leckenby*'s holding that O.R.S. 646.638 does not provide a remedy for personal injury. 38 Or.App. at 318, 589 P.2d 1209. Searle's motion to dismiss Allen's claim under the Oregon Unfair Trade Practices Act is granted.

**9.** *Warranty Claims*

 Searle moves to dismiss or for summary judgment against Allen's claims for breach of express and implied warranties. Allen moves to strike or for partial summary judgment against Searle's affirmative defenses to these claims of warranty disclaimer (No. 11) and lack of privity (No. 12).

Searle contends that Allen's deposition testimony forecloses her from proving that she relied on a warranty or that there was any causal connection between a breach of warranty and her injuries. Searle points to Allen's testimony that she decided to purchase an IUD prior to seeing her physician, Dr. Johnson, based upon discussions with her friends (Allen Deposition, p. 55), and to Allen's testimony that she read a package insert at Dr. Johnson's office, but has no recall of anything she read (Allen Deposition, p. 68).

Allen has submitted an affidavit stating that she read and relied on the package insert, although she does not recall what it said at this time. Searle replies that a subsequent affidavit contradicting Allen's deposition testimony does not create a genuine issue of fact. *See Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 544 (9th Cir.1975). However, a factfinder could reasonably conclude that Allen's affidavit does not directly contradict her deposition testimony, but adds to and explains that testimony. Therefore, the court will consider Allen's affidavit.

Allen submits that she read and relied on a package insert, and that her deposition testimony and the deposition testimony of Dr. Johnson are sufficiently clear to allow the court to determine which package insert she read and to determine the terms of any warranties made and/or breached by Searle. Allen's identification of the package insert is based on the recollections of Allen and Dr. Johnson that the package insert and/or an information card recommended having the Cu–7 replaced after two years.[6] Searle contends that Allen was

---

**6.** A package insert distributed before 1978 in-

structed users to have the Cu–7 replaced after

given a different package insert than the one Allen claims she read.

The court finds that Allen has presented evidence from which a factfinder could conclude that she read and relied on a particular package insert. The various package inserts have been produced in discovery, so that it will be possible to determine at trial whether Searle made express warranties in the relevant package insert.

Allen's claim for breach of the implied warranty of merchantability does not depend on a showing that she relied on statements in a package insert or other statements made by Searle. Unless properly excluded or modified, the implied warranty of merchantability is present in every sale of goods by a merchant, warranting that the goods are fit for the ordinary purposes for which such goods are used. O.R.S. 72.3140.

Searle has raised the affirmative defense that it disclaimed all express and implied warranties. The disclaimer language cited by Searle is found in a package insert first disseminated by Searle in 1977. The earlier insert does not contain any disclaimer. As discussed above, there is a factual issue as to which insert was given to Allen. Therefore, Allen's motion to strike or for summary judgment against Searle's affirmative defense of warranty disclaimer is denied.

■ Searle also contends that Allen's express and implied warranty claims must fail because Allen is not in privity with Searle, and because Allen did not give prompt notice of the alleged breach of warranty. Allen does not contend that she is in privity with Searle or that she gave prompt notice of her claim. Allen contends that under Oregon law, notice and privity are not required in a warranty action for personal injuries resulting from the purchase of a product.

It is undisputed that notice and privity were essential elements of a warranty claim before the development of strict liability. *Redfield v. Mead, Johnson & Co.,*

266 Or. 273, 283, 512 P.2d 776 (1973). Allen relies on *Markle v. Mulholland's, Inc.,* 265 Or. 259, 272, 509 P.2d 529 (1973), in which the Oregon Supreme Court stated that "impediments to recovery, such as notice, privity, disclaimer, and limitation of remedy, make little sense in the usual context of personal injury cases." However, the quoted portion of the *Markle* opinion concerns a strict liability claim, not a warranty claim. The *Markle* decision did not hold, as Allen contends, that notice and privity are not required in personal injury warranty claims.

Recent Oregon decisions have indicated that privity is a requirement in some, but not all, warranty claims. In *Colvin v. FMC Corp.,* 43 Or.App. 709, 716, 604 P.2d 157 (1979), the court held that privity is required for implied warranty claims for economic damages and for personal injury damages to a person outside the distributive chain. The *Colvin* court did not reach the issue of personal injury damages to a remote purchaser within the usual distributive chain, such as Allen.

In *Dravo Equipment Co. v. German,* 73 Or.App. 165, 169, 698 P.2d 63 (1985), the court held that express warranties could extend to remote purchasers who were not in privity with the original seller of a product. The court noted that it makes sense that implied warranties should not extend beyond the original transaction because implied warranties are imposed on a seller by statute, but that express warranties are distinguishable because the seller is free to make them as broad or narrow as it chooses. *Id.* at 170, 698 P.2d 63.

Thus, it appears that lack of privity does not bar Allen's express warranty claim under Oregon law. As discussed above, Oregon law is less clear as to Allen's implied warranty claim. Although Oregon decisions require privity for most implied warranty claims, the opinions have carefully distinguished claims for personal injuries by remote purchasers of consumer goods.

two years. A later package insert, which was first distributed in late 1977, instructed users to have the Cu-7 replaced after three years. There

is a factual dispute about the length of time it took for the "three-year" package inserts to reach practitioners such as Dr. Johnson.

In the absence of a case on point, the court is unwilling to find that Oregon law bars such claims.

■ The court has not located any Oregon decision holding that notice is no longer required in a warranty action for personal injuries resulting from the purchase of a consumer product. On the contrary, in *Redfield, supra,* an action against a contraceptive drug manufacturer, the Oregon Supreme Court stated that O.R.S. 72.6070 "indicates that notice is an essential element of plaintiff's case" for breach of warranty. 266 Or. at 284, 512 P.2d 776. In the absence of any authority for abolishing the notice requirement, and in the absence of any evidence that Allen gave notice of her express or implied warranty claims, this court must rule that Allen has not established an essential element of her warranty claims.

The court will grant Searle's motion for summary judgment against Allen's warranty claims and deny Allen's motion to strike or for summary judgment against Searle's affirmative defense of lack of privity.

### 10. *Fraud and Misrepresentation Claim*

■ Searle moves for summary judgment against Allen's fraud and misrepresentation claim. Allen contends that Searle misrepresented the safety of the Cu–7 by omitting information regarding the risk of pelvic inflammatory disease, salpingitis, infertility, and ectopic pregnancy from the package insert distributed before 1978.

Under Oregon law, the elements of a fraud or misrepresentation claim are:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Rice v. McAlister,* 268 Or. 125, 128, 519 P.2d 1263 (1974).

Searle contends that summary judgment is appropriate because Allen cannot show an actionable misrepresentation, reliance on any misrepresentation, or a causal connection between any misrepresentation and Allen's injuries.

Searle argues that Allen's deposition testimony establishes that she did not rely on any representation made by Searle because her decision to use the Cu–7 was based solely on discussions with her friends. As detailed in the warranty discussion, Searle seeks to exclude Allen's subsequent affidavit which states that she read and relied on the Cu–7 package insert. For the reasons stated in the warranty discussion, the court will consider Allen's affidavit.

The issue of reliance is ordinarily left to the jury. *Smith v. United States Escrow Corp.,* 89 Or.App. 224, 229, 748 P.2d 168 (1988). The court finds that Allen has presented evidence from which a jury could reasonably conclude that Allen relied on the package insert in her decision to use a Cu–7.

Moreover, Allen has presented the affidavit of her treating physician, Dr. Johnson, in which he states that he first learned of and began to prescribe the Cu–7 in 1974–75; that he read and relied upon Searle's Cu–7 package insert (the early version) in 1974–75; that he recalls that Searle promoted the Cu–7 as appropriate for use in nulliparous patients; and that because the package insert does not mention salpingitis, infertility, or ectopic pregnancy, he did not consider these conditions to be risks of the Cu–7. Similarly, Dr. Johnson interpreted the statement that "[u]ncommonly, pelvic infection has been reported" to mean that although a woman could contract pelvic infection while wearing the Cu–7, the Cu–7 did not increase the risk of PID.

In *Tetuan, supra,* the Kansas Supreme Court upheld a verdict for damages in a fraud case brought by a woman against the manufacturer of the Dalkon Shield, despite the fact that the woman's physician did not tell her what brand of IUD he was inserting and she did not know that she had a Dalkon Shield until after it was removed.

The court in *Tetuan* held that "where a patient relies on a physician for treatment or advice as to an ethical or prescription device, justifiable reliance by the physician on misrepresentations or concealment by the manufacturer of that device constitutes justifiable reliance by the patient." *Id.; accord, Kociemba, supra,* 680 F.Supp. at 1303.

▉ Oregon law imposes on drug manufacturers a comparable duty to warn the medical profession of dangerous side effects of a drug. *See McEwen, supra,* 270 Or. at 385, 528 P.2d 522 (negligence action based on oral contraceptive manufacturer's failure to warn). The court finds that Allen has presented evidence that Dr. Johnson relied on information provided by Searle in prescribing the Cu–7 for Allen. Evidence of her doctor's reliance could satisfy the justifiable reliance requirement for Allen.

Searle contends that it cannot be held liable for the omissions claimed by Allen because silence or nondisclosure does not constitute a representation unless the defendant had a duty to disclose the information or actively concealed the information. *Caldwell v. Pop's Homes, Inc.,* 54 Or.App. 104, 111, 634 P.2d 471 (1981). Searle argues that it had no duty to make disclosures to Allen because a drug manufacturer's duty to warn extends only to the physician. *McEwen, supra,* 270 Or. at 386–87, 528 P.2d 522. However, Searle ignores the *McEwen* court's language that "[a]lthough the duty of the ethical drug manufacturer is to warn the doctor, rather than the patient, the manufacturer is directly liable to the patient for a breach of such duty." *Id.*

▉ If a patient may bring a negligence claim based upon a drug manufacturer's failure to warn her physician, as in *McEwen*, it follows that a patient may bring a fraud claim based upon a drug manufacturer's failure to disclose risks to her physician. Searle has cited no relevant authority precluding such a claim. The decision in *Philpott, supra,* upon which Searle relies, discusses fraud only in the context of estoppel to assert the statute of limitations.

In addition, Allen has presented evidence from which a factfinder could conclude that Searle actually concealed information regarding the hazards of the Cu–7. Concealment may be found in "[a]ny words or acts which create a false impression covering up the truth." *Caldwell, supra,* 54 Or.App. at 113, 634 P.2d 471, quoting Prosser, *Law of Torts,* section 106, at 695 (4th ed 1971). A jury could find that Searle's package insert purported to list all of the risks associated with the Cu–7, but that Searle omitted risks which were known to it.

Searle contends that Allen cannot show a causal connection between her injuries and any representations made by Searle. This contention depends on Searle's argument that there is no evidence of reliance or of an actionable misrepresentation. The court has found that Allen has presented evidence sufficient to support a finding that Allen (or her physician) relied on representations by Searle in choosing the Cu–7. If Allen establishes those elements of her fraud claim, the record is replete with factual issues regarding the causal connection between the Cu–7 and Allen's injuries. Therefore, Searle's motion for summary judgment against Allen's claim for fraud and misrepresentation is denied.

11. *Impairment of Future Earning Capacity*

Searle moves to dismiss or for summary judgment against Allen's claim for impairment of future earning capacity. Allen does not oppose this portion of Searle's motion. Therefore, the court will grant Searle's motion to dismiss Allen's claim for impairment of future earning capacity.

12. *Anthony Allen's Claims*

Searle moves to dismiss or for summary judgment against Anthony Allen's non-consortium claims. Anthony Allen has voluntarily dismissed all of his claims. This portion of Searle's motion is deemed moot.

13. *Superseding Cause, Misuse, and Contributory Fault*

Allen and Keys move to strike or for partial summary judgment against Searle's affirmative defenses of superseding cause

(No. 4), misuse or unusual sensitivity (No. 8), and contributory fault (No. 9).

Searle's fourth affirmative defense states: "Plaintiffs' ... alleged damages, if any, were the result of intervening, superseding conduct of others." Searle's eighth affirmative defense states: "Plaintiffs' ... injury ... resulted from misuse, or abuse or unintentional and unforeseeable use, or unusual sensitivity to the Cu–7." Searle's ninth affirmative defense states: "Plaintiffs were themselves comparatively at fault."

Allen and Keys contend that Searle's defense of intervening or superseding cause must fail because Searle has not identified an intervening or superseding source of injury. Searle responds that 1) there is evidence in the record indicating that any injuries to Allen and Keys were caused by their own actions, by medical treatment obtained subsequent to their use of the Cu–7 or by sexually transmitted diseases, all of which could be considered intervening or superseding causes; and 2) the court has authorized further discovery regarding the health and sexual histories of Allen and Keys, and such discovery may produce evidence of intervening or superceding causes.

The parties repeat essentially the same contentions regarding the defenses of misuse or unusual sensitivity and contributory fault. This court authorized further discovery regarding sexual histories and treating physicians after these motions were briefed. That discovery could produce evidence relevant to the challenged defenses. Therefore, the court finds that it would be premature to grant a motion to strike or for summary judgment at this time.

The motions of Allen and Keys to strike or for summary judgment against Searle's fourth, eighth and ninth affirmative defenses are denied.

### 14. State of the Art

Allen and Keys move to strike or for partial summary judgment against Searle's seventh affirmative defense, which alleges: "Defendants took precautions and affirmative actions as were consistent with the state of the art, industry practice and custom, general scientific or medical knowledge and standards existing at the times pertinent to this lawsuit."

Allen and Keys contend that this "state of the art" defense must fail because 1) Searle had actual and constructive knowledge of the dangers posed by the Cu–7; and 2) Searle could have designed the Cu–7 differently or used different warnings which would have improved its safety. Searle responds that the record contains evidence controverting Allen and Keys' contentions on each of these points, so that summary judgment on this affirmative defense is not appropriate.

It is not necessary to recapitulate the evidence discussed in previous sections of this opinion. The court has found that there are factual issues with regard to the safety of the Cu–7, the adequacy of warnings provided with the Cu–7, and Searle's knowledge of any risks posed by the use of the Cu–7. These factual issues preclude summary judgment against Searle's state of the art defense.

The motions of Allen and Keys to strike or for summary judgment against Searle's seventh affirmative defense are denied.

### Conclusion

The motion of plaintiffs Allen and Keys for declaratory judgment or partial summary judgment establishing a duty to warn consumers directly is denied.

The motion of Searle to dismiss or for summary judgment is granted as to Keys' action (CV86–1659). The motion of Searle to dismiss or for summary judgment is granted in part and denied in part as to Allen's action (CV86–1402–FR), as follows. The motions of plaintiffs Allen and Keys to strike Searle's affirmative defenses, or for partial summary judgment on those defenses are granted in part and denied in part, as follows.

Searle's motion for summary judgment on the issue of the adequacy of warnings is denied. Searle's motion for summary judgment on the issue of Comment k is denied. Plaintiffs' motions to strike or for summary judgment against Searle's affirmative defense based on Comment k (No. 10) are denied.

Searle's motion for summary judgment on the issue of federal preemption is denied. The motions of Allen and Keys for summary judgment against Searle's affirmative defenses based on federal preemption (Nos. 3, 5 and 6) are granted.

Searle's motion to dismiss and for summary judgment against Allen is denied. Allen's motion to strike or for summary judgment against Searle's affirmative defense based on the statute of limitations (No. 1) is denied.

The court finds that Keys filed her action more than two years after the statute of limitations began to run on her claim. Therefore, Keys' action against Searle is barred. Searle's motion for summary judgment against Keys' action (CV86–1659–FR) is granted.

Searle's motion for summary judgment against Allen's claims for punitive damages is denied. Searle's motion to dismiss Allen's claim under the Oregon Unfair Trade Practices Act is granted. Searle's motion for summary judgment against Allen's warranty claims is granted. Allen's motion to strike or for summary judgment against Searle's affirmative defense of lack of privity is denied.

Searle's motion for summary judgment against Allen's claim for fraud and misrepresentation is denied. Searle's motion to dismiss Allen's claim for impairment of future earning capacity is granted.

Searle's motion to dismiss or for summary judgment against Anthony Allen's nonconsortium claims is deemed moot because Anthony Allen has voluntarily dismissed all of his claims.

The motions of Allen and Keys to strike or for summary judgment against Searle's fourth, eighth and ninth affirmative defenses are denied. The motions of Allen and Keys to strike or for summary judgment against Searle's seventh affirmative defense are denied.