## In re ZYPREXA PRODUCTS LIABILITY LITIGATION.

**Jennifer Carpentier, Plaintiff,**

**v.**

**Eli Lilly & Company, Defendant.**

**Nos. 04–MD–1596 (JBW), 07–CV–1458 (JBW).**

United States District Court, E.D. New York.

May 28, 2010.

J. Christopher Ide, Miller & Associates, Alexandria, NY, for Plaintiff.

Andrew R. Rogoff, Matthew J. Hamilton, Nina M. Gussack, Pepper Hamilton LLP, Philadelphia, PA, Samuel J. Abate, Jr., Pepper Hamilton LLP, New York, NY, for Defendant.

## MEMORANDUM, ORDER & JUDGMENT

JACK B. WEINSTEIN, Senior District Judge.

### Table of Contents

I. Introduction ................................................... 103

II. Facts ......................................................... 103
    A. Contents and Use of Zyprexa ........................... 103
    B. Labeling and Warnings to Patients and Medical Professionals ............... 103
        1. FDA Labeling and "Dear Doctor Letter" ............................. 103
        2. Consensus Statement of American Diabetes Association and Other Learned Groups ............................................ 105
        3. FDA March 2007 Letter ........................................ 106
        4. Findings on Medical Community's Knowledge of Zyprexa's Risks ......... 106
    C. Plaintiff's Medical History and Treating Physicians' Decision to Prescribe Zyprexa ....................................................... 108

III. Law ......................................................... 111
    A. Summary Judgment Standard ........................... 111
    B. Choice of Law ......................................... 112
    C. Oregon State Law ..................................... 112
        1. Statute of Limitations ........................................ 113
        2. Learned Intermediary Doctrine ................................. 113

IV. Application of Law to Facts .................................. 115

V. Conclusion .................................................. 116

## I. Introduction

Defendant Eli Lilly & Company ("Lilly") moves for summary judgment. Plaintiff, a resident of Oregon, treated medically in Oregon, commenced this action against Lilly in the United States District Court for the Eastern District of New York on April 5, 2007. The action is essentially a negligence claim, based on a failure to warn of the dangers of an antipsychotic drug produced by Lilly, Zyprexa. Money damages are sought for injuries, alleging that: (1) Zyprexa caused plaintiff's diabetes; (2) Lilly failed to warn of the dangers of weight gain and diabetes from the use of Zyprexa; and (3) Zyprexa would not have been prescribed, and diabetes would not have been suffered, if proper warnings had been given.

Argument on Lilly's summary judgment motion was heard on March 31, 2010. Plaintiff was granted 30 days to conduct additional discovery concerning issues raised in the motion. The 30 days having elapsed, plaintiff has made no additional submission to the court, and has initiated no further discovery. *See* May 18, 2010 letter from Lilly's counsel, Docket Entry No. 19.

For the reasons indicated below, defendant's motion for summary judgment is granted, based on Oregon statute of limitations.

## II. Facts

The present case is part of a massive and highly complex multidistrict litigation that has included claims by individual Zyprexa users, state attorneys general, third-party payors, and other entities alleging physical or financial injury. Some 30,000 cases have been brought against Lilly by individual plaintiffs suffering from serious psychiatric problems who were treated with Zyprexa. Like the present plaintiff, they principally allege that Zyprexa caused deleterious side effects of excessive weight gain, hyperglycemia, and diabetes; that Lilly misled them and their physicians about the likelihood of these side effects; and that, had they or their attending physicians been aware of the risks, they would not have taken Zyprexa. The court has previously detailed the procedural history and factual background of this multidistrict litigation. *See, e.g., Mississippi v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, 671 F.Supp.2d 397 (E.D.N.Y.2009); *Blume v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, Nos. 04–MD–1596, 06–CV–2782, 2009 WL 3596982 (E.D.N.Y. Oct. 20, 2009).

### A. Contents and Use of Zyprexa

Zyprexa's active ingredient is olanzapine, one of a class of medications known as "atypical" or "second generation" antipsychotics. It was approved for use in treating schizophrenia and acute manic episodes associated with bipolar disorder by the United States Food and Drug Administration ("FDA") in 1996. In 2004, the FDA also approved Zyprexa for the treatment of bipolar disorder generally.

### B. Labeling and Warnings to Patients and Medical Professionals

#### 1. FDA Labeling and "Dear Doctor Letter"

The original 1996 Zyprexa package insert accompanying the drug disclosed information about possible side effects of administration of olanzapine based on clinical trials. The insert provided, in part, the following information:

> *Adverse Events Occurring at an Incidence of 1% or More Among Olanzapine–Treated Patients in Short–Term, Placebo–Controlled Trials*—Table 1 enu-

merates the incidence, rounded to the nearest percent, of treatment-emergent adverse events that occurred during acute therapy (up to 6 weeks) of schizophrenia in 1% or more of patients treated with olanzapine (doses ≥ 2.5 mg/day) where the incidence in patients treated with olanzapine was greater than the incidence in placebo-treated patients.

The prescriber should be aware that the figures in the tables and tabulations cannot be used to predict the incidence of side effects in the course of usual medical practice where patient characteristics and other factors differ from those that prevailed in the clinical trials. Similarly, the cited frequencies cannot be compared with figures obtained from other clinical investigations involving different treatments, uses, and investigators. The cited figures, however, do provide the prescribing physician with some basis for estimating the relative contribution of drug and non-drug factors to the side effect incidence in the population studies.

Zyprexa Package Insert 11 (Oct. 1, 1996) (original emphasis).

Two tables in the insert provided the results of placebo-controlled clinical studies of olanzapine-treated patients. The data indicates that, over a six-week administration of Zyprexa, six percent of olanzapine-treated patients reported weight gain, while only one percent of the placebo-treated patients reported weight gain. *Id.* at 12–16.

For several years, this information on the insert remained substantially the same insofar as it provided physicians information on reported weight-gain-related adverse events. During this period, the results of longer-term studies and clinical experience with Zyprexa and competing drugs supporting weight gain, hyperglyce-mia, and diabetes became widely known. *See* Part II.B.4, *infra.*

In May 2000, the FDA undertook an analysis of the incidence of diabetes and hyperglycemia in patients using atypical antipsychotics. The director of the FDA's Division of Neuropharmalogical Drug Products requested additional safety information about Zyprexa from Lilly. In its letter, the FDA cited post-marketing reports of diabetes-related adverse events associated with Zyprexa use. In response, Lilly provided the FDA with clinical studies, data analysis, and case report reviews. *See In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 119 (E.D.N.Y.2008). There is disagreement about whether the information given by Lilly to the FDA was complete and accurate.

On September 11, 2003, the FDA announced it would require a warning about risks of hyperglycemia and diabetes mellitus and treating precautions to appear in the package insert of all atypical antipsychotics, including Zyprexa. Designed for prescribing doctors, the label noted that epidemiological studies and other information indicated that the relationship between the drug and hyperglycemia and diabetes was not yet fully understood. It reads as follows:

**WARNINGS**

**Hyperglycemia and Diabetes Mellitus**

Hyperglycemia, in some cases extreme and associated with ketoacidosis or hypersomolar coma or death has been reported in patients treated with atypical antipsychotics including Zyprexa. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders,

the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiological studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics studied. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available. . . .

Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at the beginning of treatment and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness. Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing. . . .

Letter from Russell Katz, M.D., Dep't of Health & Human Servs., to Gregory T. Brophy, Ph.D., Eli Lilly & Co., Sept. 11, 2003, at 1–2. The label did not mention weight gain or diabetes in the "warning to patients" section.

Lilly added the FDA-required language to the Zyprexa label on September 16, 2003. See Zyprexa Package Insert (Sept. 16, 2003). At the FDA's request, on March 1, 2004, it sent a "Dear Doctor" letter to physicians in the United States informing them of the 2003 label change. See In re Zyprexa Prods. Liab. Litig., 253 F.R.D. at 134–36.

### 2. Consensus Statement of American Diabetes Association and Other Learned Groups

In November 2003, the American Diabetes Association, American Psychiatric Association, American College of Clinical Endocrinologists, and the North American Association for the Study of Obesity convened a consensus development conference (the "ADA consensus conference") on the subject of the association between antipsychotic drugs and diabetes. An eight-member panel heard presentations from fourteen experts drawn from the fields of psychiatry, obesity, and diabetes, FDA representatives, and atypical antipsychotic drug manufacturers. The panel reviewed the relevant peer-reviewed English language scientific articles.

The ADA consensus conference concluded that Zyprexa and Clozaril posed an increased risk of diabetes as compared to other atypical antipsychotic drugs. The consensus statement produced by the conference declared that these relative risks as well as advantages of the drugs for individual patients in a heterogeneous population "should . . . influence drug choice." In part, its report concluded:

There is considerable evidence, particularly in patients with schizophrenia, that treatment with [atypical antipsychotics] can cause a rapid increase in body weight in the first few months of therapy that may not reach a plateau even after 1 year of treatment. There is, however, considerable variability in weight gain among the various [atypical antipsychotics] . . . .

\* \* \*

Clozapine [Clozaril] and olanzapine [Zyprexa] . . . produce the greatest weight gain.

\* \* \*

Despite limitations in study design, the data consistently show an increased risk for diabetes in patients treated with clozapine [Clozaril] or olanzapine [Zyprexa] compared with patients not receiving treatment with [first generation antipsychotics] or with other [atypical antipsychotics]. The risk in patients taking risperidone and quetiapine is less clear; some studies show an increased risk for diabetes, while others do not. The two most recently approved [atypical antipsychotics], aripiprazole and ziprasidone, have relatively limited epidemiological data, but available clinical trial experience with these drugs has not shown an increased risk for diabetes.

\* \* \*

[T]he risks of obesity, diabetes, and dyslipidemia have considerable clinical implications in this patient population and should . . . influence drug choice.

Even for those medications associated with an increased risk of metabolic side effects, the benefit to specific patients could outweigh the potential risks. For example, clozapine [Clozaril] has unique benefits for treatment-refractory patients and those at significant risk for suicidal behavior. Since treatment response in many psychiatric conditions is heterogeneous and unpredictable, physicians and patients can benefit from the availability of a broad array of different therapeutic agents.

\* \* \*

These three adverse conditions [obesity, diabetes, and dyslipidemia] are closely linked, and their prevalence appears to differ depending on the [atypical antipsychotic] used. Clozapine [Clozaril] and olanzapine [Zyprexa] are associated with the greatest weight gain and highest occurrence of diabetes and dyslipidemia. Risperidone and quetiapine appear to have intermediate effects. Aripipra-

zole and ziprasidone are associated with little or no significant weight gain, diabetes, or dyslipidemia, although they have not been used as extensively as other agents.

The choice of [atypical antipsychotic] for a specific patient depends on many factors. The likelihood of developing severe metabolic disease should also be an important consideration.

American Diabetes Association, et al., Consensus Development Conference on Antipsychotic Drugs and Obesity and Diabetes, 27 Diabetes Care 596, 596–97 (Feb. 2004).

### 3. FDA March 2007 Letter

On March 27, 2007, the FDA raised new concerns about the adequacy of Zyprexa's warning label in a letter to Lilly:

[W]e are concerned that the labeling is deficient with regard to information about weight gain, hyperglycemia, and hyperlipidemia that is associated with olanzapine [Zyprexa] use . . . .

Our overall goal is to improve labeling with regard to these findings so that clinicians will be better informed on what the risks are for their patients. They cannot make reasonable treatment decisions until they have such information. We do not feel that current labeling for . . . Zyprexa provides sufficient information on these risks, and we fully intend to insure that . . . labels are enhanced with the best available information to characterize these risks.

In re Zyprexa Prods. Liab. Litig., 253 F.R.D. at 141 (quoting Letter from Thomas Laughren, FDA, to Robin Pitts Wojcieszek, Eli Lilly & Co., Mar. 27, 2007).

### 4. Findings on Medical Community's Knowledge of Zyprexa's Risks

A universally applicable date from which the statute of limitations is to be consid-

ered to run on an individual Zyprexa user's claim has not been determined. Numerous events represent moments at which a patient, health care provider, institution, or the medical community at large arguably discovered that the cause of an alleged injury may have been the administration of Zyprexa. The evidence in this mass litigation, including medical records and the depositions of numerous doctors, suggests that it was widely known and understood in the late 1990s among treating and prescribing physicians that weight gain might follow the administration of Zyprexa. The association between weight gain and heightened risk of diabetes was also broadly recognized by that time.

Formal events bringing this information to the medical profession include the September 2003 Zyprexa label change and contemporaneous press release, the 2003 consensus statement of the American Diabetes Association, and the March 2004 "Dear Doctor" letter distributed nationwide to physicians by Lilly.

In its June 2007 memorandum, order, and judgment on four motions for summary judgment in individual Zyprexa injury cases, this court found that, for purposes of these motions, the March 1, 2004 "Dear Doctor" letter would be considered the latest possible date on which members of the medical community knew or should have known about Zyprexa's obesity- and diabetes-related risks to patient health. *See, e.g., Souther v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.),* 489 F.Supp.2d 230, 278 (E.D.N.Y.2007). In *Souther,* applying the relevant "learned intermediary" doctrine, it was determined that Souther's claim was barred by the statute of limitations:

> Diabetes developed and Zyprexa was prescribed [to plaintiff Cusella] years before the September 2003 label change. *At least from the date of March 2004 Dear Doctor letter, the causal connection between Zyprexa and diabetes was known to Dr. Ganime, Cusella's treating physician.* Since Lilly's duty to warn ran to Dr. Gamine rather than Cusella, it became Dr. Ganime's duty from that point onwards to disclose to Cusella that Zyprexa might exacerbate his diabetes, and that it may have been the impetus behind Cusella's insulin-dependancy in the first place.

> Dr. Ganime's medical records and deposition testimony . . . show that Cusella was warned numerous times about the link between Zyprexa and diabetes. While the pre-label change warnings Dr. Ganime received from Lilly *may* not have been adequate to absolve Lilly of liability to Cusella, those warnings Cusella received from Dr. Ganime following the label change placed him on notice that use of Zyprexa might have worsened his diabetes and caused him to become insulin-dependent.

> *Measured either against the date Cusella developed diabetes—August 1999—or the latest possible date Dr. Gamine was aware of the potential causal connection between Zyprexa and diabetes—March* 2004—Pennsylvania's two year statute of limitations had run on Cusella's claim before he filed this suit in April of 2006.

*Id.* (emphases added; citations to record omitted).

The March 1, 2004 date represents the "latest possible date" prescribing physicians and, in effect, their patients are deemed aware of the potential causal connection between Zyprexa and diabetes and from which the statute of limitations may run as to any individual plaintiff. Nevertheless, a fact-specific analysis is necessary for each case to determine when the plaintiff—whether independently or by operation of the learned intermediary doctrine—

knew the potential causal connection between Zyprexa and adverse health effects. The facts in many individual cases including the instant one indicate a much earlier date of discovery for purposes of the statute of limitations. *See, e.g.,* Appendices A–D of *Souther v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.),* 489 F.Supp.2d 230 (E.D.N.Y.2007) (including relevant depositions demonstrating doctors' awareness of Zyprexa's association with patient weight gain).

## C. *Plaintiff's Medical History and Treating Physicians' Decision to Prescribe Zyprexa*

Jennifer Carpentier is a thirty-two-year-old Portland, Oregon resident with a history of severe mental illness dating back to her teenage years. Deposition of Jennifer Carpentier ("Pl. Dep.") at 11–12, 64. At age 17, she was diagnosed with adjustment disorder after a suicide attempt, and was diagnosed with bipolar disorder two years later. Pl. Dep. at 64; CARPENTIERJ_KP_0376–78; CARPENTIERJ_KP_0003, 0044 (medical records dated Dec. 1994, June 1998). Over the years she has received many other mental health diagnoses, including borderline personality disorder, dissociative disorder, post-traumatic stress disorder, major depressive disorder, obsessive compulsive disorder, bulimia nervosa, anorexia, anxiety, dermatillomania, self-mutilation, schizoaffective disorder, conversion disorder, poly-substance abuse, somatization disorder, mood disorder, and attention deficit hyperactivity disorder. Defendant's Statement of Undisputed Material Facts ("SUF") ¶ 3 & Ex. 7–8, 10–13 (medical records from 1998–2008); *see also* Deposition of Dale Norma Oller, M.D. ("Oller Dep.") at 34. She has also reported repeated symptoms of hallucinations, delusions, paranoia, and suicidal ideations. *See, e.g.,* CARPENTIERJ_KP_0011;

CARPENTIERJ_OLLERD_0399; CARPENTIERJ_OHSU_00249, 365 (medical records dated Mar. 1998, Jun. 2006, Mar. 2008, Aug. 2008). She was hospitalized on at least three occasions for mental health reasons (including multiple suicide attempts), and had taken many antipsychotic and antidepressant medications before ever taking Zyprexa, including Depakote®, Effexor®, Buspar®, Zoloft®, Prozac®, Klonopin®, Wellbutrin®, Restoril®, Trazodone®, Diamox®, Compazine®, Flexeril®, and amitriptyline. *Id.* ¶¶ 4–5 & Exs. 7–9, 11, 13.

Mrs. Carpentier's history of physical health problems is equally extensive. She was obese from a young age, and her additional physical ailments over the years included stroke, pseudotumors cerebri, chronic fatigue, dysmenorrhea, sinusitis, temporomandibular joint disorder, hypothyroidism, sleep apnea, chronic acid reflux, pneumonia, restless leg syndrome, seizures or pseudoseizures, ovarian cysts, gall stones, diverticulitis, fibromyalgia, chronic cholecystitis, fatty liver disease, ulcers, convulsions, sepsis, Hepatitis A, diabetes mellitus, and pancreatitis. *See* Pl. Dep. at 50, 79, 105–07, 138–39; SUF at ¶ 6 & Exs. 4, 7, 9, 11, 14–17. She has at times smoked up to three packs of cigarettes per day, has a history of drug and alcohol abuse, and has a family history of diabetes, hyperlipidemia, high blood pressure, cardiac arrest, and mental illness. Pl. Dep. at 58–62; Plaintiff's Fact Sheet ("PFS") at 7; CARPENTIERJ_GREENC_0012; CARPENTIERJ_OLLERD_0459–0460.

Dr. Dale Oller, a board certified psychiatrist in Portland, Oregon, has practiced psychiatry since her graduation from Oregon Health Science Medical School in 1991. SUF ¶ 8; Oller Dep. at 13–18. In 1999 she launched her current general psychiatric practice, through which she has treated a female patient population. *Id.*

Dr. Oller started prescribing atypical antipsychotic medicines, including Zyprexa, soon after they were introduced to market. *Id.* at 26–27. She has found Zyprexa to be a "very" safe and effective medicine and still prescribes it today. *Id.* at 27. She also believes Zyprexa is "one of the best [medications] we have to offer," and she uses it as a first-line agent; she felt the same way about the medication in 1999. *Id.* at 116–117, 120–21. She has "always known that the atypical antipsychotic class [of drugs which includes Zyprexa] carry [sic] with it a weight gain" side-effect. *Id.* at 26. "I have never seen a patient on Zyprexa that did not have weight gain," she explained at deposition. *Id.* at 107. She also declared that "before the metabolic syndrome, lingo was bantered around [in connection with the 2003 class-wide label change] ... [w]e could look up and see that there were some increased weight, which is always associated with diabetes." *Id.* at 130.

When prescribing an atypical antipsychotic medicine to a patient, Dr. Oller balances the risk of weight gain against the benefit that a patient might receive from the medicine. *Id.* at 92–94. Weight gain has been a significant concern among Dr. Oller's female patient population. *Id.* at 41–42, 118. Thus Dr. Oller's psychiatric practice has focused on healthy nutrition, sensible eating, and exercise, "particularly because so many psychiatric medications are weight gainers," she explained. *Id.* at 39. Dr. Oller also monitors the overall health of her patients by ordering blood tests or requesting lab results from her patients' primary care doctors. She followed that procedure while treating Mrs. Carpentier. *Id.* at 135–38.

Dr. Oller began treating Mrs. Carpentier in April 1999. *Id.* at 33. Mrs. Carpentier presented to Dr. Oller having already been diagnosed as bipolar. *Id.* at 34; *see also* CARPENTIERJ_OLLERD_459–461 (initial evaluation by Dr. Oller). Dr. Oller confirmed that diagnosis and also diagnosed Mrs. Carpentier with poly-substance abuse in remission, post traumatic stress disorder, and borderline personality disorder. *Id.*

At the outset of treatment, Mrs. Carpentier was concerned about gaining weight from her psychiatric medicines. Oller Dep. at 44–45, 52. She has been obese most of her life, and reported to Dr. Oller that she had gained 80 pounds as a result of the Depakote she had taken previously. *Id.* at 38, 45; *see also* CARPENTIERJ_OLLERD_0229, 242 (medical records dated May, Dec. 1999).

Weighing the potential benefit of Zyprexa for Mrs. Carpentier against Mrs. Carpentier's concerns about gaining weight from her medicines, Mrs. Carpentier's long standing obesity, and Dr. Oller's own belief that Zyprexa was "a weight-gaining medicine," along with the known side effects of potential alternative medications, Dr. Oller started Mrs. Carpentier on 2.5 mg of Zyprexa in May 1999. Oller Dep. at 40–41, 44–45; *see also* CARPENTIERJ_OLLERD_0041 (log reflecting prescriptions from May 1999 through July 2000). Dr. Oller is "quite sure" she discussed Zyprexa's weight gain potential with Mrs. Carpentier when first prescribing the medicine:

Q: Do you recall whether you would have discussed—or whether you discussed with Mrs. Carpentier the possibility that she might gain weight on Zyprexa?

A: Even though I haven't got it documented, I work only with women, and I have yet to find a woman who says they're ready to gain weight. So I'm quite sure I did.

Oller Dep. at 41–42.

And indeed, Zyprexa proved effective for Mrs. Carpentier. By July 1999, Dr.

Oller had increased Mrs. Carpentier's Zyprexa dosage to 10 mg. *See* CARPENTIERJ_OLLERD_0041. Mrs. Carpentier, however, complained of weight gain and fatigue on Zyprexa. Oller Dep. at 44–45. Rather than discontinue Zyprexa, Dr. Oller instead reduced the dosage to 5 mg because the medicine was working.

Q. How was her bipolar being controlled?

A. I, at that time, was using the Zyprexa to control symptoms, and her primary mood stabilizer was Depakote.

Q. Was the Zyprexa being effective at this time?

A. I felt it was effective, but I responded to her complaint of weight gain by asking her to decrease it to 5 milligrams, but not to discontinue it.

*Id.* By September 2000, Mrs. Carpentier's Zyprexa dosage was back up to 15 mg. *Id.* at 47; *see also* CARPENTIERJ_OLLERD_0219 (medical records dated Sept. 2000). Both Mrs. Carpentier and her prescribing psychiatrist considered Zyprexa to be effective at controlling her psychotic symptoms. Pl. Dep. at 143; Oller Dep. at 44–45, 47, 126–27.

Mrs. Carpentier had shown excessive weight before she began taking Zyprexa. In the three years before beginning treatment with Dr. Oller, Mrs. Carpentier gained over 100 pounds. CARPENTIERJ_PPMC_0465 (medical records dated 1998). In May 2002, Mrs. Carpentier underwent a gastric bypass surgical procedure to address her longstanding obesity. Deposition of Jamshid Nazarian, M.D. ("Nazarian Dep.") at 62. Blood tests taken in connection with this procedure revealed an elevated fasting glucose level of 159, which led bariatric surgeon Dr. Jamshid Nazarian to diagnose Mrs. Carpentier with diabetes. Nazarian Dep. at 44–45, 64. At his deposition, Dr. Nazarian explained the notations in the medical records:

Q. ... [C]ould you read the first full sentence for us, please. It begins: "Her comorbid."

A: Okay. "Her comorbid medical problems include shortness of breath on minimal exertion, diabetes with a glucose of 159 on fasting mode, severe easy fatigability with minimal exertion, symptoms of sleep apnea.

\* \* \*

Q. Okay. So you had lab work that showed that on fasting her glucose lev1el was 159?

A. Yes.

Q. And so a determination was made at this time that the patient was diabetic?

A. Yes, that was fasting blood sugar, and fasting blood sugar goes to maximum 100, 110.

\* \* \*

Q. But was it your view that when [Mrs.] Carpentier was discharged from the hospital in or about May 26, 2002 that she had diabetes?

A. Yes.

Nazarian Dep. at 45, 64. Mrs. Carpentier confirmed that she was diagnosed with diabetes in 2002 in a supplement to her sworn Plaintiff Fact Sheet and in her deposition. SUF Ex. 3 (supplement to PFS), Pl. Dep. at 53–54.

Mrs. Carpentier did not tell Dr. Oller about her diabetes diagnosis. Oller Dep. at 130–31. Following Mrs. Carpentier's gastric bypass surgery, Dr. Oller discontinued Zyprexa because of her concern about weight gain. Oller Dep. at 50–51. Dr. Oller advised Mrs. Carpentier of her concerns in July of 2002 and substituted Seroquel® for Zyprexa in September 2002. Oller Tr. 52, 55–56; *see also* CARPENTIERJ_OLLERD_0205 (medical record dated July 2002); CARPENTIERJ_OLLERD_0193 (medical record dated Sept.

2002). Even had Mrs. Carpentier advised Dr. Oller of her prior diagnosis of diabetes, the doctor says she might still have prescribed Zyprexa because it was so effective.

> Q. If you were aware that Mrs. Carpentier was diabetic prior to her gastric bypass surgery, would you have continued to prescribe Zyprexa to her?
>
> A. Well, I might have, for the reason that it was so effective with her. And she was so ridden with many psychiatric problems that it targeted.

Oller Dep. at 126–27.

Seroquel failed to control Mrs. Carpentier's psychosis. By March 2003, Mrs. Carpentier started to report suicidal thoughts and self-mutilation (*i.e.,* "cutting"). *Id.* at 60; *see also* CARPENTIERJ_OLLERD_0180 (medical records dated March 2003). By April 2003, Mrs. Carpentier reported that many of her psychiatric symptoms were even worse. Oller Dep. at 61; *see also* CARPENTIERJ_OLLERD_0178. Accordingly, in June 2003, Dr. Oller reevaluated her concern about potential weight gain from Zypexa and, in light of Mrs. Carpentier's past success on the medicine and recent weight loss, resumed Zyprexa:

> Q. On June 6th, you appear to have noted or recorded a recommendation for medication.
>
> A. Yes.
>
> Q. What did you note?
>
> A. I recommended to use Zyprexa for her mania psychosis and mood stabilization. Because ... of the gastric bypass, one cannot overeat and, therefore, I felt secure about the weight gain issue.
>
> Q. So acknowledging the weight gain issue, you thought, in this case, it would be the best medicine for the patient?
>
> A. Yes. And I noted previous positive results with Zyprexa.

*Id.* at 63. One month after resuming Zyprexa, Mrs. Carpentier reported that her psychiatric symptoms were not as severe as they had been when she was on Seroquel, and Dr. Oller noted that Zyprexa was controlling her symptoms. *Id.* at 57, 66; CARPENTIERJ_OLLERD_0173.

Following 2003, when the FDA mandated a class-wide warning that all atypical antipsychotics could be associated with an increased risk of hyperglycemia events, Dr. Oller continued to prescribe Zyprexa to Mrs. Carpentier for three more years because she considered hyperglycemia an acceptable risk due to Zyprexa's efficacy for Mrs. Carpentier. Oller Dep. at 90, 139–40.

In May 2006, plaintiff was examined by a gastroenterologist in France who diagnosed diabetes following an abnormal blood glucose reading of 145. CARPENTIERJ_MHC_0062; *see also* CARPENTIERJ_GREENC_0018. Dr. Oller was informed of the abnormal blood glucose level on May 31, 2006 and immediately discontinued Zyprexa. Oller Tr. 112; CARPENTIERJ_OLLERD_0414. Plaintiff currently experiences no symptoms of diabetes and does not take any diabetes medication. CARPENTIERJ_OHSU_00379, 01002, CARPENTIERJ_SAUVAIN00805, CARPENTIERJ_SAUVAIN01469 (medical records from Mar. 2008, May 2008, Jul. 2009).

## III. Law

### A. *Summary Judgment Standard*

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and if the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d

Cir.1999). Summary judgment is warranted when after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); *see Anderson,* 477 U.S. at 247–50, 255, 106 S.Ct. 2505; *Sledge v. Kooi,* 556 F.3d 137, 140 (2d Cir.2009).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed.R.Civ.P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture[.]" *Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir.1996); *see also Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue.").

## B. *Choice of Law*

■ A multidistrict litigation transferee court applies the choice of law and statute of limitations rules of the state in which the action was filed. *Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir.1993) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). Because the instant action was originally commenced in New York, that state's choice of law principles apply.

■ Under New York law, the Court should apply the law of the state with the greatest interest in the litigation. *See A. Conner Gen. Contracting, Inc. v. Rols Capital Co.,* 145 A.D.2d 452, 535 N.Y.S.2d 420, 422 (Sup.Ct.App.Div.1988); *see also*

*Miller v. Miller,* 22 N.Y.2d 12, 290 N.Y.S.2d 734, 237 N.E.2d 877, 878–89 (1968) (applying the law of the state that has the greatest interest "because of its relationship or contact with the occurrence or the parties"). Mrs. Carpentier ingested Zyprexa while living in Oregon, was treated by Dr. Oller in Oregon, claims to have suffered injury as a result of Zyprex in Oregon and continues to live in Oregon. As the state with the greatest interest in this litigation, Oregon law applies to Mrs. Carpentier's claims. *See Eric Fuller v. Eli Lilly and Co. (In re Zyprexa Prods. Liab. Litig.),* No. 06–CV–2782 (E.D.N.Y. Aug. 6, 2009) (order granting summary judgment) (applying California law to products liability claims where plaintiff lived in California, was prescribed Zyprexa in California, ingested Zyprexa in California, and developed diabetes in California); *Dwight Dean v. Eli Lilly and Co. (In re Zyprexa Prods. Liab. Litig.),* No. 07–CV–4505 (E.D.N.Y. Jul. 8, 2009) (order granting summary judgment) (applying Florida law to product liability claims where plaintiff lived in Florida, was prescribed Zyprexa in Florida, ingested Zyprexa in Florida, and developed diabetes in Florida).

## C. *Oregon State Law*

Plaintiff asserts eight different causes of action, all of which rest on the same allegation that Lilly failed to warn about the risks of Zyprexa. *See, e.g.,* Compl. ¶ ¶ 22, 35, 47, 52, 59 (Alleging that Lilly is strictly liable for the "defect" of inadequate labeling and *failure to warn* about the risks of Zyprexa; that Lilly was negligent through its *failure to warn* about the risks of Zyprexa; that Lilly's *failure to warn* about the risks of Zyprexa constituted a breach of express and implied warranties; that Lilly's *failure to warn* about the risks of Zyprexa was deceptive and constituted fraud and fraudulent concealment) (em-

phasis added). Regardless of their headings, these claims all derive from the same failure-to-warn concept, and therefore should be subject to Oregon law governing failure to warn claims.

### 1. Statute of Limitations

Under the current version of Oregon Revised Statute ("ORS") 30.905, effective January 1, 2004, a product liability civil action for personal injury must generally be commenced not later than two years after the plaintiff discovers, or reasonably should have discovered, the personal injury and the causal relationship between the injury and defendant's product or conduct. ORS 30.905(1). The prior version of ORS 30.905, which did not include a "discovery rule," applies to injuries occurring prior to January 1, 2004. *See.* 2003 Or. Laws. ch. 768 § 2(1) (H.B. 2080) (stating that "the amendments to ORS 30.905 by Section 1 of this 2003 act apply only to deaths, personal injuries or property damage that occurs on or after the effective date of this 2003 act [*i.e.,* January 1, 2004]."). That prior version afforded a product liability plaintiff two years from the date of *injury* to bring suit. OR. REV. STAT. § 30.905(2) (2002); *see also Gladhart v. Oregon Vineyard Supply Co.,* 332 Or. 226, 26 P.3d 817, 821 (2001) (holding that the two years period of limitation "begins to run when the 'death, injury or damage complained of happens, whether or not the plaintiff discovers the harm within the ensuing two years.'"). Because Mrs. Carpentier's alleged injury occurred in 2002, the prior version of ORS 30.905 applies. Accordingly, the later-adopted discovery rule does not apply to this case. *See George v. Western Homes Corp.,* No. 05–6150–AA, 2007 WL 2138602, at *3, 2007 U.S. Dist. LEXIS 53731, at *8–*9 (D.Or. July 21, 2007) (stating that "[i]f *former § 30.905* applies, plaintiffs were required to file suit within two years after *occurrence* of their

alleged damage or injury.") (emphasis in original); *Starr v. Dow Agrosciences LLC,* 339 F.Supp.2d 1097, 1103 n. 3. (D.Or.2004) (acknowledging that application of the pre-amendment statute of limitations to plaintiff's product liability claim would not include a discovery rule).

### 2. Learned Intermediary Doctrine

Oregon law has historically adopted the learned intermediary doctrine, which provides that, in a failure to warn product liability case, "the duty of the ethical drug manufacturer is to warn the doctor, rather than the patient.... the manufacturer's compliance with this duty enables the prescribing physician to balance the risk of possible harm against the benefits to be gained by the patient's use of that drug." *McEwen v. Ortho Pharm. Corp.,* 270 Or. 375, 528 P.2d 522, 529 (1974) (footnote and citation omitted); *see also Vaughn v. G.D. Searle & Co.,* 272 Or. 367, 536 P.2d 1247, 1250–51 (1975) (en banc) (holding that, where a different warning would not have changed doctor's behaviour, the plaintiff could not establish proximate cause), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Allen v. G.D. Searle & Co.,* 708 F.Supp. 1142, 1147–48 (D.Or.1989) (applying the learned intermediary standard to failure to warn claims).

As this Court stated in *Souther,* a manufacturer's "responsibility in this area is to provide adequate warnings to physicians. It is the physician who is in the best position to decide when to use and how and when to inform his patient regarding risks and benefits pertaining to drug therapy." *Souther,* 489 F.Supp.2d at 265 (citing Prosser and Keeton on the Law of Torts, 688 (5th ed. 1984)).

The learned intermediary defense is an aspect of proportionality that shifts at least some of the burden of protecting patients from pharmaceutical manufacturers to treating physicians ... [T]he

learned intermediary rule cannot be viewed as an all-or-nothing regulation that absolves the manufacturer, shifting the onus entirely to the treating physician, but its force in ameliorating liability for damages of the manufacturers cannot be ignored.

*Souther*, 489 F.Supp.2d at 244. There is a strong trend in prescription drug failure-to-warn cases to reiterate and apply this well established doctrine. *See, e.g., Dietz v. Smithkline Beecham Corp.,* 598 F.3d 812, 816 (11th Cir.2010) (affirming summary judgment was proper where: "The doctor provided explicit, uncontroverted testimony that, even when provided with the most current research and FDA mandated warnings, he still would have prescribed [the drug].... Pursuant to Georgia's learned intermediary doctrine, this assertion severs any potential chain of causation[.]"); *Motus v. Pfizer Inc.,* 358 F.3d 659, 661 (9th Cir.2004) (holding that a product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician) (citing *Plummer,* 819 F.2d at 358–59); *Ebel v. Eli Lilly & Co.,* 536 F.Supp.2d 767 (S.D.Tex.2008) (granting summary judgment for defendant upon finding that prescribing physician was aware of Zyprexa's suicide-related risks that an adequate warning would have provided and that plaintiff had presented no evidence physician would not have prescribed Zyprexa had defendant provided him with an alternate warning label), *aff'd,* 321 Fed. Appx. 350 (5th Cir.2009); *Allgood v. GlaxoSmithKline PLC,* No. 06–3506, 2008 WL 483574, at *3 (E.D.La. Feb. 20, 2008) (granting summary judgment for defendant because plaintiff had failed to show (1) that defendant did not adequately warn the physician of a risk associated with the drug that was not otherwise known to the physician and (2) that the "failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury"), *aff'd sub nom. Allgood v. SmithKline Beecham Corp.,* No. 08–30329, 2009 WL 6465285 (5th Cir. Mar. 13, 2009).

Despite this strong trend, the continued vitality of the learned intermediary principle as a defense to Oregon strict liability claims has been called into question by the recent decision of the Oregon Supreme Court in *Griffith v. Blatt,* 334 Or. 456, 51 P.3d 1256, 1262 (2002). In *Griffith* a pharmacist, invoking the learned intermediary doctrine, sought to avoid liability for his failing to warn a consumer of a medication's risks. The court rejected this defense, finding that "Oregon's product liability statute does not create a defense to strict liability based on the learned intermediary doctrine." *Id.* at 1262. No Oregon court has applied *Griffith* 's holding to prevent application of the learned intermediary doctrine to a pharmaceutical manufacturer, although the opinion does not explicitly limit its holding to suits against pharmacists. A number of secondary sources have interpreted *Griffith* as a broadly precluding invocation of the learned intermediary doctrine as a defense to any "failure to warn" claim pursuant to Oregon's strict products liability statute, ORS 30.900 *et seq. See* David G. Owen, M. Stuart Madden, and Mary J. Davis, *Madden & Owen on Prod. Liab.* § 9:8 (3d ed. 2009); 63A Am.Jur.2d *Products Liability* § 1200 (2010); *Form, Expression, and Dissemination of Warnings,* Am. L. Prod. Liab. 3d § 33:32, (2010); *Oregon Rejects Learned Intermediary Defense to Strict Liability,* 163 Products Liability Advisory 1 (September 2002); *cf.* Myron J. Bromberg and Linda Pissott Reig, *Warnings to the Patient by a Prescriber in Pharmaceutical Litigation,* 47 No. 11 DRI For The Defense 10 (2006) (noting that "[o]nly one aberrant decision appears to reject the

learned intermediary defense in its entirety, *Griffith v. Blatt,* . . . albeit the holding is arguably limited to the duty of a pharmacist."). At least one post-*Griffith* district court opinion appears to ignore the case entirely. *See Schleining v. Chicago Pneumatic Tool Co.,* No. 04–CV–1413–BR, 2006 WL 696309 (D.Or. Mar. 15, 2006) (recognizing learned intermediary defense in products liability suit). In light of limited Oregon case-law on point, and because plaintiff's claims are barred in any event by the statute of limitations, the court declines to resolve whether the learned intermediary principle would constitute a valid defense to plaintiff's strict liability claims under Oregon law.

## IV. Application of Law to Facts

■ In this case, the limitations period began to run when Dr. Nazarian diagnosed Mrs. Carpentier with diabetes in May 2002. The absence of a discovery rule makes it immaterial when Mrs. Carpentier first associated her condition with Zyprexa. The period within which Mrs. Carpentier could have asserted claims against Lilly expired in May 2004. She did not file her Complaint until April 5, 2007, nearly three years too late. Her claims are time-barred.

Plaintiff contends that the period of limitations did not begin to run in 2002 because Dr. Nazarian's 2002 diagnosis was based on a single elevated fasting plasma glucose reading of 159, whereas commonly accepted diagnostic procedures require two abnormal test results, obtained on different days. *See* Plaintiff's Brief at 34–37 (citing American Diabetes Association, *Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus,* Diabetes Care, Vol. 29, Supp. 1, at S12) (Jan. 2002) ("ADA report") (further citations omitted). Even assuming that Dr. Nazarian's

methodology did not strictly comport with the ADA's recommendations, plaintiff has not pointed to any evidence suggesting that Dr. Nazarian's diagnosis was thereby unreliable. Several facts suggest the diagnosis was accurate. *First,* while the record of what Dr. Nazarian relied on is incomplete, it is clear that a single abnormal blood sugar reading was not the sole fact he considered. *See* Nazarian Tr. 24 (noting plaintiff had morbid obesity, approaching super-morbid obesity, which makes individuals prone to diabetes); 56–57 (noting that post-operative blood glucose tests were performed, but that they were considered less accurate). *Second,* there is no evidence that either Dr. Nazarian or any other physician expressed reservations about the accuracy of the 2002 diabetes diagnosis, which was referred to in numerous subsequent medical records, and which plaintiff apparently believed to be accurate. *See* CARPENTIERJ_SGH_0016 (August 2002 record from Sutter General Hospital noting plaintiff's "known diabetes mellitus."); JC–01–000007 (December 2002 medical record from Dr. Craig Greenberg noting "DM [diabetes mellitus] Type II Uncontrolled"); PFS at 2 (stating "Diabetes—diagnosed in May 2002 by Dr. Navarian . . . in 2007 was diagnosed again by Dr. Greenberg."). *Third,* the conditional probability that the 2002 diagnosis was accurate is considerably increased by the confirmatory fact that plaintiff was later diagnosed with diabetes.

In any event, the relevant question is not whether plaintiff's 2002 test results satisfy the medical definition of "diabetes," but rather whether those tests results show some injury for which plaintiff could have sought a legal remedy. Plaintiff does not dispute that the 2002 glucose reading was markedly abnormal; the sources cited by plaintiff describe such a glucose level as presenting a substantially increased risk

for a number of adverse outcomes. *See* ADA Report at S13–S14. As courts in Oregon and elsewhere have recognized, "[g]enerally, there is but one single, indivisible cause of action for all injuries arising from the same tortious conduct, even though the ultimate damage or injury is unknown or unpredictable.... [t]hus, subsequently discovered injuries do not cause the limitations period to recommence when these injuries are attributed to the same source." 63B Am.Jur.2d Products Liability § 1581 (2010); *see e.g., Allen v. G.D. Searle & Co.,* 708 F.Supp. 1142, 1156–57 (D.Or.1989) (collecting cases and noting that "although the result seems harsh," where the "full extent of injuries may not be discoverable until after the statute of limitations has run on a claim, [we] hold that the statute of limitations begins to run when a plaintiff knows that he or she has suffered *some* injury because of the defendant's acts.") (emphasis in original); *see also Schiele v. Hobart Corp.,* 284 Or. 483, 490, 587 P.2d 1010 (Or.1978) (rejecting plaintiff's contention "that nothing short of a positive diagnosis by a physician" will begin the running of the statute of limitations, and concluding that discovery rule is satisfied where information exists which would lead "a reasonable person to conclude she is being seriously or permanently injured in some way)." Whether or not the medical data available to Dr. Nazarian in 2002 sufficed to diagnose diabetes for treatment purposes, the statute of limitations began to run on the date of Mrs. Carpentier's May 2002 elevated glucose reading, which manifested some serious injury.

Plaintiff further contends that her claim is not time-barred because in late 2005 or early 2006 she contracted a second illness, pancreatitis, in part due to her ingestion of Zyprexa. To the extent that this condition consists of a further injury resulting from the same source—her ingestion of Zy-prexa—it is untimely because the statute of limitations began to run with her diagnosis of diabetes in 2002; the fact that the injury later manifested as a new illness does not re-start the running of the statute of limitations. *See Allen,* 708 F.Supp. at 1156–57. Plaintiff's complaint of pancreatitis is also barred because her medical records reveal that her pancreatitis first occurred in 2002—five years before she filed suit. In a handwritten patient questionnaire that plaintiff completed for Dr. Daniel Root, a sleep specialist, plaintiff notes repeated bouts of "chronic pancreatitis" in 2002, 2004, 2005 and 2006. CARPENTIERJ_ROOTD_0020. Similarly, plaintiff's June 2006 type-written medical history summary states that she suffered "Chronic Pancreas Problems (on and off since 2002)." CARPENTIERJ_MHC_0062.

## V. Conclusion

Summary judgment against the plaintiff is granted on the basis of the statute of limitations.

SO ORDERED.